Carol M. HERBERT and Henry W. Herbert, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 86 Civ. 5377 (CLB).

United States District Court, S.D. New York.

June 1, 1987.

Henry W. Herbert, New York City, pro se.

Edward Ferguson, Asst. U.S. Atty., New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

This is an action against the Government filed by plaintiffs Carol M. Herbert and Henry W. Herbert, cosignatories of a joint tax return, seeking a refund of $12,752.70 [1] in federal income tax, claimed to have been wrongfully assessed and collected from plaintiffs by the Internal Revenue Service ("IRS") for the tax year 1982. Jurisdiction arises under 28 U.S.C. § 1346(a)(1).

The parties have filed motions for summary judgment, which were fully submitted to this Court for a decision on April 6, 1987, upon receipt of a letter from the plaintiffs reporting the decision of the Honorable Barron P. McCune in a parallel case filed in the Western District of Pennsylvania, *Sutherland v. United States*, 664 F.Supp. 207 (W.D.Pa.1987). For the reasons stated below, the taxpayers' motion is granted and the Government's motion is denied. The Court finds that there is no genuine issue of disputed fact which requires a trial.

These undisputed facts are as follows. Plaintiff Henry W. Herbert ("taxpayer") was actively employed by the New York Central Railroad, Penn Central Railroad and Consolidated Rail Corporation ("Conrail"), successively, from November 27, 1957 through December 31, 1978. In January 1979, taxpayer was "deprived of employment" with Conrail within the meaning of Title V of the Regional Rail Reorganization Act, 45 U.S.C. § 722 *et seq.*, as a result of which he was entitled to job and wage protection benefits provided for in Title V, until age 65.

Upon the enactment of the Northeast Rail Service Act ("NERSA") in 1981, in which Congress repealed Title V and replaced it with Title VII, 45 U.S.C. § 797 *et seq.*, former Conrail employees who had been entitled to benefits under Title V became eligible for benefits under the new

Title VII. The United States Railroad Retirement Board ("Board"), the agency charged with administering Title VII, gave former Conrail employees eligible for Title VII benefits two options: (1) a lump sum termination allowance, or (2) alternative benefits in lieu of termination of employment.

Mr. Herbert elected the first option. On or about June 8, 1982, the Board approved Mr. Herbert's election to accept a lump sum termination allowance in the amount of $20,000. Deductions were made from this sum in an amount equal to the premiums for health coverage provided for the period January through May 1982, which premiums had been paid by the Board on behalf of taxpayer. On or about June 14, 1982, Mr. Herbert received from the United States Department of the Treasury (which provides the funding under NERSA), a check in the amount of $19,275.31, which was approved by the Railroad Retirement Board. This represented the balance of the statutory termination allowance due him. No taxes were withheld by the United States from the termination allowance so awarded.

In a joint tax return for the 1982 tax year, signed by Henry W. and Carol M. Herbert, plaintiffs failed to declare this lump sum payment as taxable income.

By letter dated December 1, 1983 to George A. Delaney, Director of the Bureau of Unemployment and Sickness Insurance of the Railroad Retirement Board, and apparently in response to his query, Richard H. Manfreda, Chief of the Individual Income Tax Branch of the Internal Revenue Service, provided information regarding the federal income tax consequences of benefits paid pursuant to section 701 of Title VII of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 797 *et seq.* (Exhibit 1 of Plaintiffs' 3(g) Statement). The IRS agent therein found no clear and specific statement of the intended federal income tax consequences in the statute or its legislative history, and reasoned that: "the language of § 705(b) was merely intended to

---

**1.** The Complaint seeks a refund of $12,782.60, a figure which apparently resulted from a mathematical error (*see* Defendant's Memorandum of Law at 3, n. **).

deal with the manner in which the payments and other benefits of Title VII would be treated for purposes of the Railroad Retirement Act and the Railroad Unemployment Insurance Act." Therefore, he concluded, all benefits and payments made pursuant to Articles III and IV of the benefit schedules are includible in the gross income of a recipient-employee, with the exception of contributions made by the Railroad Retirement Board on behalf of an employee to provide for continuing health and welfare protection prior to the employee's election to take a lump-sum termination payment. The letter regarded the lump sum payments as "wages" for purposes of federal income tax withholding, and instructed the Railroad Retirement Board henceforth to cause the withholding of federal income tax from the payments made by the United States Treasury pursuant to this statute.

On July 15, 1985, the Director of the Internal Revenue Service, North Atlantic Region, notified plaintiffs that, because they had not on April 15, 1983 declared as taxable income the "RRB wages" of $19,275.31 or the "medical adjustment" of $724.69 as required "per the IRS ruling of December 1, 1983", plaintiffs' owed the IRS an additional $12,445.60, representing a tax deficiency of $9,471.00 plus interest from April 15, 1983 in the amount of $2,974.60 (Exh. A to Complaint). Mr. Herbert responded to this notice on August 12, 1985 by requesting a hearing before a member of the Director's appeals office (Exh. B to Complaint). Plaintiffs allege that no response to this letter was ever received by them, and Defendant denies knowledge or information as to this particular matter (Answer para. 13). The Court notes that this minor factual dispute is neither relevant nor material to the determination of the question of law presented.

On or about October 16, 1985, plaintiffs paid the claimed deficiency with interest, and on December 10, 1985 filed with the IRS a claim for refund of the sums paid under protest. In April 1986, the IRS assessed, and plaintiffs paid, additional interest in the amount of $307.10, bringing the total amount paid by plaintiffs to $12,-752.70 (Exhibit E to Complaint).

■ The plaintiffs filed the Complaint commencing this action for a refund on July 9, 1986. Plaintiffs contend, and Defendant admits (Answer para. 17), that over six months have elapsed since they mailed to the Director a claim for refund and, therefore, the jurisdictional requirements of 26 U.S.C. § 7422(a) have been met. By reason of the execution and signing by the plaintiffs of the consent and waiver on October 16, 1985, and the payment by plaintiffs of the outstanding deficiency with interest, the time within which to bring this action commenced on October 16, 1985, and no notice for a disallowance was required to be mailed by the Director to the plaintiffs (Complaint para. 16; Answer para. 18). The Court holds at the outset that all procedural requisites have indeed been met, and this case is properly brought in this Court.

The question presented by these cross motions for summary judgment is solely one of law: whether the lump sum separation allowance paid to a former Conrail employee pursuant to 45 U.S.C. § 797 is subject to federal income tax.

The separation allowance was paid to Mr. Herbert pursuant to Section 797d(b) of Title VII, "Protection of Employees", 45 U.S.C., which provides that:

"(b) Treatment of benefits

Any benefits received by an employee under an agreement entered into pursuant to section 797 of this title and any termination allowance received under section 797a of this title *shall be considered compensation solely for purposes of—*

(1) the Railroad Retirement Act of 1974 (45 U.S.C. 321, *et seq.*); and

(2) determining the compensation received by such employee in any base year under the Railroad Unemployment Insurance Act (45 U.S.C. 351, *et seq.*)" (emphasis added).

The dispute as framed by the parties is essentially a question of interpretation of this statute in conjunction with the Internal

Revenue Code and the cases decided thereunder.

■ The Internal Revenue Code, 26 U.S.C. § 61(a), defines "gross income" as "all income from whatever source derived." In *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 430, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955), the Supreme Court recognized that it has long "given a liberal construction to this broad phraseology in recognition of the intention of Congress to tax all gains except those specifically exempted." Thus, a payment must constitute gross income absent a specific exemption evidencing "clear congressional intent" to the contrary. *Id.* at 431, 75 S.Ct. at 477.

Plaintiffs claim that the termination allowance received by taxpayer in 1982 is and was exempt from taxes by reason of the plain language of the statute that provides for such payments, 45 U.S.C. § 797d(b), in its specification that the benefits be considered "compensation" only for the purposes enumerated therein, of which income taxes is not one. However, the Government contends that this provision by its terms does not manifest any clear and specific Congressional intent to exempt the payments from federal income tax because it contains no reference to the words "income" or "tax", and expresses "no congressional intent whatever" on the tax consequences of such payments.

Plaintiffs cite the Treasury Regulations which accompany this definitional provision of the Internal Revenue Code, § 1.61–1 and § 1.61–2(a), and which expressly recognize that gross income and specifically, termination or severance pay, can be "excluded by law" from being considered taxable income to the recipients. They argue, and this Court agrees, that this is precisely what Congress has done with respect to this termination allowance by enacting § 797d.

Stating that no such exclusion has been demonstrated, the Government instead likens the lump-sum separation allowance to severance pay, a form of taxable income. Treas.Reg. § 1.61–2(a)(1); *see Miller v. United States*, 362 F.Supp. 1242, 1244–46 (E.D.Tenn.1973); *see also Commissioner v.*

*Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). The IRS has specifically ruled that a lump-sum payment received by a railroad employee in consideration of his relinquishment of employment rights acquired by reason of his prior service constitutes ordinary income, taxable in the year of receipt. Rev.Rul. 44, 1975–1 C.B. 15. In that case, the employee entered into an agreement with his employer to perform a different type of work and to refrain from asserting his previously acquired employment rights to security in his employment and to additional pay or other recognition for longevity. However, as plaintiffs correctly assert, that ruling did not involve a lump-sum payment awarded pursuant to any statute such as § 797. Moreover, here Mr. Herbert was required to relinquish, in addition to the right to continued employment, "any cause of action for loss of benefits resulting from the repeal of Title V ...", 45 U.S.C. § 797d(a), 20 C.F.R. § 395.3(c)(3)(ii), as discussed more fully below.

■ Accordingly, the Court deems this revenue ruling to be inapplicable to payments made pursuant to § 797, because they are a species different in kind from, and something more than, simple severance pay.

■ Urging that the phrase therein, "shall be considered compensation solely for the purposes of", demonstrates such clear Congressional intent that these payments not be considered taxable income, the plaintiffs assert the proposition that one should not go beyond unambiguous statutory language to legislative history for the purpose of inferring Congressional intent. In *Wisconsin Electric Power Co. v. Department of Energy*, 778 F.2d 1, 4 (D.C.Cir.1985), the court ruled against the Secretary, finding that "[his] interpretation would thus have the unhappy result of obliterating express language from the subsection (a)(2) provision, in contravention of long-settled principles of statutory construction...." Likewise, the universal view as to the appropriate role of a legislative search is set forth as follows:

"It is a well established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls ... When the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent. As recently noted by the Supreme Court, we must start with the assumption that legislative purpose is reflected by the ordinary meaning of the language used in the statute." *Edwards v. Valdez,* 789 F.2d 1477, 1481–1482 (10th Cir.1986), *citing United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985).

*See also Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57 (2d Cir. 1985); *United States v. Perdue Farms, Inc.,* 680 F.2d 277 (2d Cir.1982). Thus, as a general proposition, resort to the legislative history to contravene or limit clear statutory language is inappropriate where the defendant is unable to cite, and the court has not found, explicit Congressional intent to the contrary.

From a plain reading of the instant statute, it appears as clear as a statute ever can be that plaintiffs' interpretation is the more reasonable. The Court is now called upon to construe a statute enacted by Congress which has expressly placed limitations and "restrictive labels as to [the] nature" of benefits awarded to plaintiff. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. at 429–30, 75 S.Ct. at 476. Consistent with *Glenshaw* and the Federal Tax Regulations, the plain meaning of 45 U.S.C. § 797(b) clearly excludes the termination allowance from the catchall provisions of 26 U.S.C. § 61(a). This provision expressly states that the benefits provided shall be considered compensation for no purpose other than the two specified. The word "solely" means "to the exclusion of all else." *Webster's Ninth New Collegiate Dictionary* (1984). "Solely for" means "exclusively for" or "only for". *United States v. Esperdy,* 277 F.2d 537, 538 (2d Cir.1960); *Stockton Harbor Indus. Co. v. Commissioner of Internal Revenue,* 216 F.2d 638, 645 (9th Cir.1954), *cert. denied,* 349 U.S. 904, 75 S.Ct. 581, 99 L.Ed. 1241 (1955) (under provision of Internal Revenue Code defining reorganization as the acquisition by one corporation, in exchange "solely" for all or part of its voting stock, the word "solely" means exclusively and leaves no leeway).

We must presume the Congress to be aware of the tax consequences of the term "compensation", which is itself a term of art which readily calls to mind visions of the federal income tax consequences. To require the statute to include the word "income" or "tax", as the Government suggests, would ask this Court to impose an unwarranted and highly artificial restriction upon plain statutory language. This would in effect ignore the words "solely for" contained in the statute, this "in contravention of long-settled principles of statutory construction." *See, e.g., Wisconsin Electric Power Co. v. Department of Energy,* 778 F.2d 1, 4 (D.C.Cir.1985).

Indeed, Congressional awareness of the income tax implications of the term "compensation" is evident in the definitional section of NERSA, 45 U.S.C. § 231(h)(7) and (8), wherein, for the purposes of annuity payments under provisions of section 231, entitled "Retirement of employees", "the term 'compensation' includes any payment from any source to an employee or employee representative if such payment is subject to tax under section 3201 or 3211 of the Internal Revenue Code of 1954." By contrast, no such explicit inclusion of income tax is made applicable to payments pursuant to § 797.

Although convinced that this matter ought to be resolved on the plain language of the statute, which almost every lay person would read as exempting this type of payment from being considered "compensation" for the purpose of federal income taxation, the Court will nonetheless review the legislative background of this employee protection provision, in light of the narrow construction generally given exclusions from tax by the Internal Revenue Service and the courts. *See, e.g., HCSC-Laundry v. United States,* 450 U.S. 1, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981); *Commissioner of Internal Revenue v. Kowalski,* 434 U.S. 77,

98 S.Ct. 315, 54 L.Ed.2d 252 (1977); *Murdock v. Ward,* 178 U.S. 139, 20 S.Ct. 775, 44 L.Ed. 1009 (1900) (an exemption from "all taxation" without exception does not affect the imposition of estate and other excise taxes).

In its search of the legislative history surrounding the passage of the statute, the defendant finds little support for its position that, despite the ordinary meaning of the word "solely", Congress intended these payments to be taxed. The Government nonetheless argues that the silence of the legislative history of 45 U.S.C. § 797d(b), and of NERSA as a whole, as to the federal income tax consequences of the receipt of these benefits is neither evidence of, nor consistent with, the requisite "clear congressional intent" to exclude such benefits from "gross income" (Defendant's Memorandum at 7).

The legislative history of Title VII, which was added to the Regional Rail Reorganization Act of 1973 by the Northeast Rail Service Act of 1981 ("NERSA"), indicates that its purpose was to "replace the extremely costly [employee] protection scheme" contained in Title V. *See* S.Rep. No. 139, 97th Cong., 1st Sess. 287, 289, 324, 332 (1980) (rest of citation omitted), U.S. Code Cong. & Admin.News 1981, pp. 396, 580, 582, 612, 620. Defendant concludes that "in light of Congress' manifest intent to lessen the fiscal burden imposed by the employee protection provisions of Title V, it would be perverse to increase the burden imposed by Title VII by reading it to require a tax expenditure by the United States" (Defendant's Memorandum at 6). However, this legislative background presents no more than tenuous and speculative support for defendant's interpretation.

While it is true that the legislative history underlying the enactment of Title VII discloses no express reference by Congress to exemption of the payments and other statutory benefits from the federal income tax, we find that such an exemption is consistent with a broader reading of the spirit and purposes of Title VII, as therein contained.

In implementing Title VII, Congress was not only interested in replacing the costly protection scheme of Title V, as suggested here by the Government. Congress also sought to provide "an alternative employee protection" plan. 45 U.S.C. § 1101(5). A straightforward expression of purpose can be found at 45 U.S.C. § 1101, "Congressional findings and declarations", which states in pertinent part that:

"(4) the provisions for protection of employees of bankrupt railroads contained in the Regional Rail Reorganization Act of 1973 [45 U.S.C.A. § 701 et seq.] have resulted in the payment of benefits far in excess of levels anticipated at the time of enactment, have imposed an excessive fiscal burden on the Federal taxpayer, and are now an obstacle to the establishment of improved rail service and continued rail employment in the Northeast region of the United States; and

(5) Since holding Conrail liable for employee protection payments would destroy its prospects of becoming a profitable carrier and further injure its employees, an alternative employee protection system must be developed and funded."

We infer from this explicit declaration that the purposes of the alternative system were twofold: to have the Federal Government, i.e., the federal taxpayer, fund the system at less cost; while at the same time continuing to protect the former Conrail employee.

Congress intended to effectuate the first goal, a fiscal concern generally present in every piece of legislation, by limiting payments to former employees to a maximum of $20,000. *See* 127 Cong.Rec. 19131, 19132, S9056, 9060 (July 31, 1981) (concern with great expense). The new Title VII reduced the benefits of Title V, which had provided protection until age 65, to one lump sum payment not to exceed $20,000 (20 C.F.R. § 395.4(c)), which it classified as "compensation" only for the specified limited purposes. The amount of an allowance was to be determined by the number of years the particular employee had been employed by Conrail and its predecessor rail-

roads as of the date of separation, subject to this ceiling. This Court concludes that Congress could not have intended to take away with one hand part of what it gave with the other. If this were so, Congress would not have been so particular in limiting the termination allowance to a fixed sum of $20,000, and in specifying that deductions would then be made for employer payments towards health and welfare coverage. Surely it did not intend additional deductions, potentially amounting to one half of the allowance, as here, to be taken from the employee and returned to the Government in the form of income tax.

We must remember the second purpose—the concern for employee protection: "The Senate bill provides protection for Conrail employees who lose their jobs as a result of transactions authorized by the bill ..." 127 Cong.Rec. S9061 (July 31, 1981). This allowance was not intended to be simply a lump sum payment for past services, or compensation, as in Rev.Rul. 44, 1975–1 C.B. 15, above, which ordinarily would then be taxable. Rather, such payments represent an early retirement *incentive,* in return for which employees forfeited their rights to a job, with its future increased tax-free benefits. Employees electing to accept a termination allowance were deemed to waive any employee protection benefits otherwise available, and "any claim for any alleged loss of benefits resulting from repeal of Title V of the Act or from any other provision of the Northeast Rail Service Act" 45 U.S.C. § 797d(a); 20 C.F.R. § 395.3(c)(3)(ii). *See also* 127 Cong. Rec. S9060 (July 31, 1981) (purpose also to protect Conrail). The rights to a pension and unemployment insurance benefits were not forfeited by the acceptance of a termination allowance (45 U.S.C. § 797(a)(2)). Mr. Herbert notes, however, that his pension would have been greater if he had worked longer; and such pension would be tax-free (Letter to the Court dated February 23, 1987).

Nor is this forfeiture simply in connection with the statutory or contractual right to continued employment, as contended by the Government, citing *United Transportation Union v. Consolidated Rail Corporation,* 535 F.Supp. 697, 705–709 (Regional Rail Reorg. Act) (Friendly, J.), *cert. denied* 457 U.S. 1133, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982) (section of Regional Rail Reorganization Act upheld against due process and equal protection challenges). Defendant reasons that wages earned through continued employment would be taxable, and hence the payment given the employee to relinquish the right to sue for continued employment should not be taxable (Letter to the Court dated February 17, 1987). However, even if the Court were to adopt defendant's depiction of the action as a claim only for continued employment, this would not support a conclusion of taxability. The result achieved by such a suit would ultimately be recovery of compensatory damages for wrongful or tortious termination of employment, and a lump sum recovered by judgment or settlement in such a lawsuit would not be taxable. 26 U.S.C. § 104(a)(2); *Commissioner v. Glenshaw Glass Co.,* 348 U.S. at 432, n. 8, 75 S.Ct. at 477, n. 8; *Agar v. Commissioner of Internal Revenue,* 290 F.2d 283 (2d Cir. 1961); *Grunfeder v. Heckler,* 748 F.2d 503, 516 (9th Cir.1984) (en banc). If by accepting Title VII benefits, the employee has forfeited his right to bring the action for wrongful termination, then the payment in connection with this forfeiture should in logic also be nontaxable.

To require the former Conrail employee to repay the Government in taxes would reduce his benefits still further, particularly since Title VII has already decreased the benefits that were available to him under Title V. Such an additional sacrifice would be a senseless result which the Court must assume to be inconsistent with the concern for employee protection as expressed by the Congress.

The legislative history reveals that Congress specifically utilized the term "compensation" only because of a peculiarity of the structure of unemployment insurance compensation, to preserve the eligibility of employees deprived of employment to railroad unemployment insurance. One purpose of labelling the payments as compensation was the following:

"Subsection (d) preserves the eligibility of employees deprived of employment to railroad unemployment insurance. Under a peculiarity of the Railroad Unemployment Insurance Act, for purposes of establishing eligibility for future coverage a separation allowance is treated as income only on the day it is paid ... The bill would disallow eligibility for benefits immediately after payment of the allowance but would treat the allowance as if it had been paid as regular wages for purposes of establishing future eligibility. This protection may be required by some employees ... The provision also eliminates the anomalous situation whereby an employee's entitlement to unemployment insurance following the disqualification period may depend upon the date on which he was separated."
127 Cong.Rec. S9061, 19131 (July 31, 1981); H6961 (August 4, 1981).

This passage indicates that Congress did contemplate consequences of the term "compensation", and yet made no reference to any potential tax effects. The insurance peculiarity also clarifies why the termination allowance was to be considered compensation at all. The resulting plain language, "solely for", set forth the exclusive purposes for which it would be considered "compensation."

The only reference to taxation in connection with the employee protection scheme provides that: "These payments would be considered taxable earnings for the purposes of the Railroad Unemployment Insurance Act." 127 Cong.Rec. S19142 (July 31, 1981). Once the appropriate amounts are then calculated and distributed, the unemployment insurance benefits are not subject to "any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever." 45 U.S.C. § 352(e). Such a specification of "taxable earnings" remains consistent with this Court's reading of the certain limited purposes for which these payments would be considered taxable earnings.

The failure of the legislative history specifically to address the federal income tax consequences of payments made pursuant to § 797 does not, as the defendant contends, necessitate that this Court overlook the plain meaning of the provision. In *United Transportation Union v. Consolidated Rail Corporation*, 535 F.Supp. 697, 705 (Regional Rail Reorg. Act) (Friendly, J.), *cert. denied* 457 U.S. 1133, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982), interpreting another provision of Title VII governing severance of employees of Conrail, the court held that:

"When the evidence revealed by an excursion into materials simply forming a part of the basis on which Congress acted is 'sufficiently ambiguous ... to invite mutually destructive dialectic but not strong enough either to strengthen or weaken the force of what Congress has enacted,' a court should disregard it." *Citing FCC v. Columbia Broadcasting System*, 311 U.S. 132, 61 S.Ct. 152, 85 L.Ed. 87 (1940).

In addition, our Court of Appeals has so instructed, in *United States v. Perdue Farms Inc.*, 680 F.2d 277, 284 (2d Cir.1982):

"As aptly put by the Supreme Court in *Gemsco Inc. v. Walling*, 324 U.S. 244, 260 [65 S.Ct. 605, 614–15, 89 L.Ed. 921] (1945): 'The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance may furnish dubious bases for inference in every direction'. Except where necessary to avoid an absurd result, see *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631 [98 S.Ct. 2053, 56 L.Ed.2d 591] (1978)—a situation not presented here—the court will not depart from the words chosen by Congress merely because there is a dearth of words in the legislative history which support the plain meaning of the statute" (citations omitted).

The legislative history cited by the Government does not adequately support its interpretation of the statute. In its failure to provide any support other than legislative silence, the defendant has failed to demonstrate either "rare and exceptional circumstances" or "the most extraordinary showing of contrary intentions" to "justify

a limitation on the plain meaning of the statutory language." *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 62–63 (2d Cir.1985).

This Court concurs with the district court in *Sutherland v. United States*, 664 F.Supp. 207 (W.D.Pa.1987), that the lump sum termination benefits should not be treated as income and thus are not taxable. Upon a review of the legislative history, that court concluded:

"... we do not read § 797d(b) and its accompanying legislative intent as requiring the payments to be treated as defendant suggests. The relevant wording of § 797d(b) 'compensation solely for purposes' of the Railroad Retirement Act of 1974 and the Railroad Unemployment Insurance Act does not, in our opinion, mandate that these payments be treated as taxable income. Rather, we find upon reconsideration that these termination payments, which were incentives for early retirement, were meant to be non-taxable. To find otherwise would produce an inequitable result not contemplated by the cited legislation. Accordingly, upon reconsideration, we find that the lump sum payments are non-taxable." *Id.* at ——.

Some guidance may be found in the somewhat analogous situation involving the question of whether public housing agency notes issued under the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, were includible in a recipient's estate for federal estate tax purposes. *Haffner v. United States*, 585 F.Supp. 354 (N.D.Ill.1984), *aff'd*, 757 F.2d 920 (7th Cir.1985), held that the exemption of securities or bonds from "taxation" or "all taxation" (a more explicit reference to tax consequences than is present in the within statute), despite the apparent literal force of the language, did not necessarily operate as an exemption from estate or inheritance taxes. However, where there is a "strong indication" in a particular statute and its legislative history that Congress intended an exemption from "all taxation" to encompass excise taxes as well, the specific Congressional intention should override the general rule of subjecting all forms of income to taxation. Based upon a reading of the legislative history which was by no means unequivocal, *see Shackelford v. United States*, 649 F.Supp. 1347 (E.D.Va.1986), the court concluded that such an exemption was therein intended, in part because "Congress ordinarily is presumed not to have used language idly: statutes are to be construed so as to give operative effect to every clause", *citing, inter alia, American National Bank v. Dallas County*, 463 U.S. 855, 103 S.Ct. 3369, 77 L.Ed.2d 1072 (1983).

Congress superseded the *Haffner* case by statute, enacting the Deficit Reduction Act of 1984, 26 U.S.C. § 641, 642. This provision expressly provided that "Nothing in any provision of law exempting any property (or interest therein) from taxation shall exempt the transfer of such property (or interest therein) from Federal estate, gift, and generation-skipping transfer taxes." *See* Staff of Joint Comm. on Taxation, 98th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 971 (Comm. Print 1985). In approving the retroactive application of this new statute, the court in *Estate of Bradford v. United States*, 645 F.Supp. 476, 479 (N.D.Cal.1986), relied upon the well-settled principle that:

" '[c]ourts have consistently upheld the retroactive application of curative legislation which corrects defects subsequently discovered in a statute and which restores what Congress had always believed the law to be.' *Long v. United States Internal Revenue Service*, 742 F.2d 1173, 1183 (9th Cir.1984). Specifically, Congress may give a tax statute retroactive effect in order to cure a perceived judicial misinterpretation of an existing statute. *Id.; Wilgard Realty Co. v. Commissioner of Internal Revenue*, 127 F.2d 514, 515–17 (2d Cir.), *cert. denied*, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527 (1942); *see also Moss v. Hawaiian Dredging Co.*, 187 F.2d 442 (9th Cir. 1951); *Seese v. Bethlehem Steel Co.*, 168 F.2d 58 (4th Cir.1948)."

Therefore, it would be appropriate for this Court to adopt a *Haffner* analysis in giving operative effect to the clause, "compensation solely for the purposes of...." The Congress may correct the instant statute if it intended other than that which emerges from the face of the statute and the legislative history, or if Congress wishes to articulate a new policy with regard to the revitalization of the railroads and the concurrent protection of its employees. The Court should not fill the gaps, if any, left by Congress in its legislative design, particularly where the Court's construction is in keeping with Congressional efforts to protect the persons affected by such design.

Moreover, considerations of equity, fairness, and equality of treatment come into consideration here. Plaintiff submits to the Court copies of Notice of Refunds made to taxpayers in Cincinnati and Philadelphia (Attachments to Plaintiffs' letter docketed February 27, 1987). The recipients of these tax refunds were former Conrail employees who had paid taxes on the separation allowance paid under § 797, under circumstances substantially identical to the situation of Mr. Herbert. Likewise, the decision in *Sutherland* was expressly supported by the fact that the Internal Revenue Service had refunded overpaid taxes to numerous other claimants who had filed amended tax returns. Mr. Herbert should not be penalized for the mere circumstance of residing in a different district, or receiving his benefits in a different political climate, than those receiving identical benefits who paid no income tax or were refunded for their overpayment of income tax.

■ It should be noted that this Court's consideration of the interests of justice and fairness in this regard does not rely upon any legal concept of estoppel or reliance. Defendant correctly asserts that the United States Government will not be bound or estopped by a position taken or misinformation given by one of its employees or agents, *Heckler v. Community Health Services,* 467 U.S. 51, 59–61, 104 S.Ct. 2218, 2223–24, 81 L.Ed.2d 42 (1984); *Schweiker v. Hansen,* 450 U.S. 785, 788–89, 101 S.Ct.

1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam); nor is a taxpayer reliance argument availing, *Dickman v. Commissioner of Internal Revenue,* 465 U.S. 330, 343, 104 S.Ct. 1086, 1094, 79 L.Ed.2d 343 (1984). (*See* Defendant's letter to the Court docketed March 12, 1987.) Such doctrines are not applicable to the within analysis. Rather, we infer these prior cases were handled correctly and in accordance with law.

■ Finally, plaintiffs make the argument that the Railroad Retirement Board, as the agency charged with the responsibility for administering Title VII, must be accorded deference. *See, e.g., Independent Bankers Ass'n v. Marine Midland Bank,* 757 F.2d 453, 461 (2d Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986); *Power Authority of State of New York v. FERC,* 743 F.2d 93, 103 (2d Cir.1984). According to plaintiffs, the Board "obviously" construed this payment as exempt when it failed to deduct federal income tax from the lump sum payment at the time of its issuance. Defendant asserts that the views of the Board are irrelevant because the question is one of legislative intent rather than administrative interpretation. The expertise of the R.R. Board does not extend to the federal income tax consequences of the statute; in fact, defendant states, the R.R. Board itself requested an IRS determination on this issue (Exhibit 1 of Plaintiffs' 3(g) Statement).

From the limited facts in the record, it is not entirely clear whether this initial failure to deduct taxes was indeed an affirmative interpretation by the Board, particularly since there does not appear to have been any direct action manifested nor explicit statements made by the Board. Moreover, the Board, upon receipt the IRS letter of December 1, 1983 so advising, apparently has begun to make such deductions. However, in light of the plain language of the statute, and the Congressional intent found in the legislative history, as discussed above, the Court finds there to be no need to address this further contention.

In addition, as to the portion of the taxes paid by plaintiffs, amounting to $724.69

**584**

plus interest, in connection with the employer contributions for health coverage, this portion is clearly exempted from taxable income under 26 U.S.C. § 61. As acknowledged by the IRS, contributions made by the Railroad Retirement Board on behalf of an employee to provide for continuing health and welfare protection prior to the termination payment are excludable from gross income pursuant to Section 106 of the Internal Revenue Code. *See, e.g.,* Opinion letter by the Internal Revenue Service to the Railroad Retirement Board dated December 1, 1983 (Exh. 1 to Plaintiff's Rule 3(g) Statement). It is unclear why the defendant has not conceded, or even addressed, this aspect of the tax payments herein contested.

The Court concludes, as a matter of law, and upon the undisputed facts, that the plaintiffs are entitled to a refund of the entire sums paid, with interest: both the portion of taxes paid as to the termination allowance and the taxes on the "medical adjustment."

Accordingly, plaintiffs' cross-motion for summary judgment is granted, and defendant's motion for summary judgment is denied. The Clerk shall enter Judgment, with prejudgment interest to be calculated at the standard rate of interest for overpayments of federal income tax.[2]

So Ordered.

2. The rate of interest on overpayments of federal tax for the relevant periods herein, is as follows:

| | | |
|---|---|---|
| February 1, 1982 | – December 31, 1982 | 20% |
| January 1, 1983 | – July 1, 1983 | 16% |
| July 1, 1983 | – December 31, 1985 | 11% |
| January 1, 1986 | – June 30, 1986 | 10% |
| July 1, 1986 | – December 31, 1986 | 9% |
| January 1, 1987 | – June 30, 1987 | 10% |

*See* Mertens, *Law of Federal Income Taxation,* § 58A.44, at 171 (1984 ed. and February 1987 Supplement); J.K. Lasser's, *Your Income Tax,* Prentice Hall Press (1987), at 248.   Interest is compounded daily only from January 1, 1983. *See* 26 U.S.C. § 6622(a) (West Supp.1986, Notes).