JOHN ROBERTS MARTIN AND SHIRLEY MAE MARTIN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 42605-85, 2334-86, 35620-86.

Filed May 24, 1988.

*John E. Rogers,* for the petitioners in docket Nos. 42605-85, 2334-86, and 35620-86.

*David G. Umbaugh,* for the petitioners in docket No. 2334-86.

*Steven K. Dick,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioners | Year | Deficiency |
|---|---|---|
| John Roberts Martin and | 1982 | $806 |
| Shirley Mae Martin | 1983 | 423 |
| Bernard J. Spanski and | | |
| Margaret L. Spanski | 1982 | 3,393 |

After concessions by petitioners, the issues for decision are: (1) Whether certain payments to Mr. Martin and Mr.

---

[1]Cases of the following petitioners are consolidated herewith: Bernard J. Spanski and Margaret L. Spanski, docket No. 2334-86, and John Roberts Martin and Shirley Mae Martin, docket No. 35620-86.

Spanski made under title VII of the Regional Rail Reorganization Act of 1973[2] (3R Act) as amended by the Northeast Rail Service Act of 1981[3] (NERSA), are includable in gross income under section 61[4] or are exempt from taxation under 45 U.S.C. section 797d(b); and (2) if includable, whether the benefits are "in the nature of unemployment compensation" and therefore taxable under section 85.

These consolidated cases have been chosen as the test cases involving the taxability of title VII benefits received by approximately 4,500 former employees of the Consolidated Rail Corp. (Conrail).[5] These cases were submitted fully stipulated under Rule 122 and were accepted by the Court for expedited handling. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioners John Roberts and Shirley Mae Martin resided in Girard, Ohio, when they filed their petitions. Petitioners Bernard J. and Margaret L. Spanski resided in Hudson, Ohio, when they filed their petition. For all the years in issue, petitioners timely filed their Federal income tax returns on a cash basis with the Internal Revenue Service Center, Cinncinati, Ohio.

The 3R Act created Conrail, 45 U.S.C. section 741 (1976), and enabled it to succeed to the rail carrier service of seven bankrupt railroads in the northeast and midwest. See 45 U.S.C. sec. 742 (1976). Title V of the 3R Act, 45 U.S.C. sections 771-780 (1976), created various employee protection benefits for Conrail employees, including monthly displacement allowances, separation allowances, and relocation allowances. Conrail was responsible for payment of the title V benefits, but Congress appropriated money to pay part of them. See 45 U.S.C. sec. 742 (1976). That appropriation was expected to cover all employee protection expenditures until the year 2021, but was used up by 1980. H. Rept. 96-1035, at 44-45 (1980), reprinted in 2 U.S. Code Cong. & Adm. News 3978, 3989-3990 (1980).

---

[2] Pub. L. 93-236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C. secs. 701-794 (1982)).

[3] The Northeast Rail Service Act of 1981 was enacted as part of the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35, secs. 1131-1169, 95 Stat. 357, 643-687 (codified as amended at scattered sections of 45 U.S.C.).

[4] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[5] Respondent estimates that more than 5,400 related cases will be affected by this decision.

Congress passed NERSA in an effort to cut Conrail's expenses and make it more attractive to outside buyers. See 45 U.S.C. secs. 1101-1103 (1982); see also S. Rept. 97-139, at 325 (1981), reprinted in 2 U.S. Code Cong. & Adm. News 396, 613 (1981). NERSA repealed title V in its entirety, Pub. L. 97-35, section 1144(a)(1), 95 Stat. 357, 669, and title VII employee protection benefits were created. Pub. L. 97-35, section 143(a), 95 Stat. at 661 (codified as amended at 45 U.S.C. sections 797-797m (1982)). The U.S. Railroad Retirement Board was charged with administering title VII. 45 U.S.C. sec. 797(e) (1982).

Under title VII, the estimated 4,600 Conrail employees who would be eliminated[6] would be eligible for benefits if they met the following requirements:

1. As of September 1, 1981, they must have been Conrail employees and have unexpired coverage under Title V of the 3R Act as of August 12, 1981;

2. They must have been "deprived of employment" because of actions taken by Conrail under provisions of the 3R Act or NERSA;

3. They must have been unable to obtain a position with Conrail, Amtrak, Amtrak Commuter Services, a commuter authority, or an acquiring railroad through the normal exercise of seniority or by written application.

Mr. Martin and Mr. Spanski were Conrail employees who were laid off in 1982. They met the requirements enumerated above and thus were eligible for benefits under title VII of NERSA.

During 1982, both Mr. Martin and Mr. Spanski each filed a claim for subsistence allowance (claim) under title VII of the 3R Act as amended by NERSA. The claims required each to make an irrevocable election of the benefits, designated as "option 1" or "option 2."

Mr. Spanski elected option 1 under 45 U.S.C. section 797. Option 1 provided for a complete resignation of seniority in exchange for a lump-sum separation allowance of $20,000 (less any other benefits paid on the employee's behalf during 1982 under 45 U.S.C. section 797(b)). By choosing the lump-sum allowance, Mr. Spanski was disqualified from receiving unemployment compensation under the Railroad Unemployment Insurance Act for a benefit period equiva-

---

[6]S. Rept. 97-139, at 332, reprinted in 2 U.S. Code Cong. & Adm. News 396, 620 (1981).

lent to the value of the lump-sum amount. During 1982, Mr. Spanski received title VII benefits of $19,589.03.[7]

Mr. Martin elected option 2 under 45 U.S.C. section 797. Option 2 provided that the employee remain in furloughed status but with no resignation of seniority. He would receive a daily subsistence allowance, continued health and welfare coverage, new career training assistance, reimbursement for moving expenses, and other benefits, to a maximum benefit of $20,000. During 1982, Mr. Martin received a title VII subsistence allowance of $8,609.49, plus health and welfare premiums paid on his behalf in the amount of $311.20. In 1983, he received a subsistence allowance of $9,373.

Both the option 1 election by Mr. Spanski and the option 2 election by Mr. Martin were approved and acknowledged by the U.S. Railroad Retirement Board.[8]

Neither Mr. Martin nor Mr. Spanski received any Forms 1099 or W-2 for 1982 or 1983 for the title VII benefits. However, in May of 1984, the Railroad Retirement Board sent each recipient of title VII benefits a "Title VII Tax Statement," which read, in pertinent part, as follows:

The Internal Revenue Service has ruled that all Title VII benefits with the exception of health and welfare premiums are subject to Federal income tax. The amounts of taxable benefits paid to you in 1982 and 1983 are shown below.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Even though taxes were not withheld from your 1982 or 1983 benefits, this does not relieve you of your tax liability. If you did not report the Title VII benefits paid to you in 1982 or 1983 on your tax returns, you must file amended returns with the Internal Revenue Service. A copy of this letter will serve in lieu of Form W-2 for calendar years 1982 and 1983.

In his notice of deficiency to Mr. Martin, respondent determined that the subsistence allowances Mr. Martin received were taxable Conrail income in 1982 and taxable "U.S. Railroad Retirement" income in 1983. In his notice of deficiency to Mr. Spanski, respondent determined that the lump sum Mr. Spanski received in 1982 was taxable

---

[7]The difference between the amount paid and the $20,000 maximum benefit payable was for health and welfare premiums paid by the Railroad Retirement Board on Mr. Spanski's behalf.

[8]None of the parties has suggested, nor do we perceive, that in resolving the issues involved herein, any distinctions should be made between the two types of benefits.

"Railroad Retirement" income. The health and welfare premiums paid on behalf of both petitioners were considered nontaxable.

We turn first to the question of whether the benefits are includable in gross income.[9] In general, gross income includes "all income from whatever source derived." Sec. 61(a). This provision is to be "given a liberal construction * * * in recognition of the intention of Congress to tax all gains except those specifically exempted." *Commissioner v. Glenshaw Class Co.*, 348 U.S. 426, 430 (1955). Correspondingly, statutory exemptions from gross income are to be given a narrow construction. *Commissioner v. Jacobson*, 336 U.S. 28, 49 (1949). See also *United States v. Wells Fargo Bank*, 485 U.S. ____ , ____ (1988) (estate tax case— "exemptions from taxation are not to be implied").

Termination and severance payments fall within the broad scope of gross income includable under section 61. See *Beggy v. Commissioner*, 23 T.C. 736 (1955), affd. per curiam 226 F.2d 584 (3d Cir. 1955); sec. 1.61-2(a)(1), Income Tax Regs. Thus, unless 45 U.S.C. section 797d(b) exempts them from taxation, the benefits paid to Mr. Spanski and Mr. Martin are includable in gross income.

45 U.S.C. section 797d(b) provides that benefits "shall be considered compensation solely for purposes of (1) the Railroad Retirement Act of 1974 (45 U.S.C. sec. 231 et seq.); and (2) determining the compensation received by such employee in any base year under the Railroad Unemployment Insurance Act (45 U.S.C. sec. 351 et seq.)." The section accomplishes two limited purposes within title 45. First, it defines the benefits as compensation for the purpose of determining retirement benefits under 45 U.S.C. section 231 et seq. (1982), and, by including the title VII benefits as compensation in "any base year," determining

---

[9]In their brief, petitioners apparently concede that the benefits are includable under sec. 61. In view of the number of taxpayers affected, the cases holding that title VII benefits are not includable in gross income (see *Sutherland v. United States*, 664 F. Supp. 211 (W.D. Pa. 1987), revg. on motion for reconsideration 664 F. Supp. 207 (W.D. Pa. 1986); *Herbert v. United States*, 662 F. Supp. 573 (S.D.N.Y. 1987), on appeal (2d Cir., July 30, 1987)); and the fact that by considering whether the benefits are includable as unemployment compensation to the extent required by sec. 85 we would be implicitly deciding that they are gross income, we choose to consider the issue explicitly. Cf. *McGowan v. Commissioner*, 67 T.C. 599 (1976) (holding that we have jurisdiction to consider a legal issue despite respondent's concession of the entire deficiency). See also *Connelly v. Commissioner*, 82 T.C. 608, 609 (1984).

the amount of unemployment compensation to be received under the Railroad Unemployment Insurance Act, 45 U.S.C. section 351 et seq. (1982), when the discharged worker becomes eligible for such unemployment compensation.[10] See S. Rept. 97-139, *supra* at 332 (The subsection "preserves the eligibility of employees deprived of employment to railroad unemployment insurance."). Second, it excludes the benefits from compensation for other purposes under title 45 so that, for example, no employer "return of compensation" to the Railroad Retirement Board would be required under 45 U.S.C. section 356, and no employer unemployment-compensation contributions would have to be paid under 45 U.S.C. section 358(a).

We do not think that 45 U.S.C. section 797d(b) shows sufficiently clear congressional intent to exempt the benefit payments from gross income, in light of the narrow construction that such exemptions are to be given. In general, when Congress excludes a payment from gross income in a statute located outside the Internal Revenue Code, it does so explicitly. See section 135 and statutes cited therein;[11] see also Hostage Relief Act of 1980, Pub. L. 96-449, sec. 201, 97 Stat. 1967, 1970;[12] 12 U.S.C. sec. 3806(c) (1982).[13] We conclude that the use of the word

[10]Under 45 U.S.C. sec. 352(a), the amount of unemployment compensation is based on the amount of income actually received in the "base year" (that is, the calendar year preceding the year during which the application is made (45 U.S.C. sec. 351(n) (1982)), but for purposes of determining eligibility for unemployment compensation, lump-sum severance payments are considered to be earned over the period following their receipt at the same rate that the employee had been paid. 45 U.S.C. sec. 354(a-1)(iii) (1982). Thus, absent 45 U.S.C. sec. 797d(b), after receiving a lump-sum benefit payment, a terminated employee might have no income in the base year when he first became eligible to apply for unemployment compensation. See S. Rept. 97-139, *supra* note 6, at 332-333.

[11]This section cross-references several statutes outside of the Internal Revenue Code that exempt certain items from income, including 38 U.S.C. sec. 3101(a) (1982) (veterans' benefit "payments made to * * * a beneficiary shall be exempt from taxation."); Merchant Marine Act, 46 U.S.C. sec. 1177(d)(1) (1982) ("For purposes of the Internal Revenue Code of 1954 * * * the earnings * * * from the investment of amounts held in the [capital construction] fund shall not be taken into account.").

[12]That section provides, in pertinent part that "For purposes of the Internal Revenue Code of 1954, the gross income of an individual who was at any time an American hostage does not include compensation from the United States received for any month during any part of which such individual was * * * in captive status." Pub. L. 96-449, sec. 201, 97 Stat. 1967, 1970.

[13]That section provides:

Tax consequences

The amount of any financial assistance provided under this chapter shall not be included in the gross income of any person for purpose of title 26, and such person shall not receive any increase in basis under title 26 which is attributable to the amount of any financial assistance provided under this chapter.

12 U.S.C. sec. 3607(c) (1982).

"solely" should not be interpreted as extending the applicability of 45 U.S.C. section 797d(b) beyond the boundaries of title 45. The word clearly does not constitute an explicit exemption from income tax, and we are not prepared to say that the purposes for which the section was enacted dictate that we read such an exemption into it and, as a consequence, avoid applying the principle of *Commissioner v. Glenshaw Glass Co., supra.*

The legislative history does not change our conclusion. To be sure, it indicates that protection of separated employees was one of the goals of NERSA, but we have not found any language, in the discussion of either the goals of NERSA or the specific provisions of 45 U.S.C. section 797d(b), that shows that defining the benefits as compensation for certain purposes was intended to exclude the benefits from gross income for tax purposes. See S. Rept. 97-139, *supra* at 325, 332-333; cf. 45 U.S.C. sec. 1101 (1982) (indicating that employee benefit programs must be decreased to cut Conrail's expenses). Silence in the legislative history is not sufficient to overcome "the presumption against implied tax exemptions." See *United States v. Wells Fargo Bank, supra* at _____ .

Both *Sutherland v. United States,* 664 F. Supp. 211 (W.D. Pa. 1987), revg. on motion for reconsideration 664 F. Supp. 207 (W.D. Pa. 1986), and *Herbert v. United States,* 662 F. Supp. 573 (S.D.N.Y. 1987), on appeal (2d Cir., July 30, 1987) (see note 9 *supra*), give a broader reading to the statute and to its legislative history. We do not think that such a reading is appropriate when determining whether a statute creates an exemption from taxation, and we decline to follow those cases.

Having decided that the benefits are gross income under section 61(a), we turn to the question of whether they are unemployment compensation and therefore includable as provided in section 85. As in effect before the Tax Reform Act of 1986, that section provided that, in certain circumstances, only a limited amount of unemployment compensation was subject to taxation, depending on the taxpayer's other adjusted gross income and the amount of unemployment compensation received. For purposes of section 85, "the term 'unemployment compensation' means any amount

received under a law of the United States or of a State which is in the nature of unemployment compensation." Sec. 85(c). The regulations provide that "unemployment compensation programs are those designed to protect taxpayers against the loss of income caused by involuntary layoff. Ordinarily, unemployment compensation is paid in cash and on a periodic basis. * * * Such payments, however, may be made in a lump sum." Sec. 1.85-1(b)(1)(i), Income Tax Regs. The regulations also list several programs as examples of unemployment compensation programs, but provide that the list is not exclusive. Sec. 1.85-1(b)(1)(iv), Income Tax Regs.

The parties agree that the benefits were paid under a law of the United States. Thus, the sole issue is whether they were "in the nature of unemployment compensation."[14] Petitioners contend that they were paid to protect laid-off workers and that title VII is similar to at least two of the programs already recognized by respondent as unemployment compensation programs—the Trade Readjustment Allowance Program, 19 U.S.C. sections 2291-2292 (1982), and the Airlines Deregulation Benefits and Allowances Program, 49 U.S.C. section 1552 (1982)—so that the title VII benefits should be considered unemployment compensation. Respondent argues that they are not unemployment compensation both because Congress defined them as compensation and because, under 45 U.S.C. section 797d(a) (1982), they were in exchange for other benefits that had previously been payable to employees.

We agree with respondent that the benefit payments are not unemployment compensation. While they were paid to protect laid-off workers, that is not dispositive. If it were, private payments to protect laid-off workers should logically be included within the definition of unemployment compensation, which they are not. Cf. *Williams v. Commissioner*, 35 T.C. 685 (1961). In addition, Congress was clearly

---

[14]The legislative history is silent as to the standards by which potential unemployment compensation programs are to be judged. See H. Rept. 96-1445, at 48-49 (1978), 1978-3 C.B. 181, 222-223. Finally, respondent's published rulings since 1978 have merely stated that certain programs are or are not unemployment compensation programs, without further explanation. See Rev. Rul. 80-23, 1980-1 C.B. 17; Rev. Rul. 79-299, 1979-2 C.B. 32. We note that the programs recognized as unemployment compensation programs in the 1979 ruling have been included in the list of unemployment compensation programs in the regulations. See sec. 1.85-1(b)(1)(iv)(C)-(E), Income Tax Regs.

concerned with preserving the terminated employees' rights to receive undiminished unemployment compensation under the Railroad Unemployment Insurance Act when the title VII benefits ended. Thus, the effect of 45 U.S.C. section 797d(b)(2) was to assure that there was to be no offset against unemployment compensation either in time or amount, i.e., once the termination payments ceased the recipient would be entitled to commence receiving unemployment compensation as if no termination payment had been made.[15]

The two programs that petitioner points to are distinguishable.[16] First, both were specifically designed to provide supplements to unemployment compensation—to be eligible for the Trade Readjustment Program, an applicant's unemployment compensation benefits must be exhausted (19 U.S.C. section 2291(a)(3) (1982)), and payments under the Airline Deregulation Program are reduced by the amount of unemployment compensation received (49 U.S.C. section 1552(b)(1) (1982)). No such tie to unemployment compensation exists with the title VII benefits—they are payable before, and regardless of whether, any application for unemployment compensation is made. Second, the programs that petitioners point to are of a more general applicability than title VII. They deal either with workers throughout the country who have become unemployed because of international trade (see 19 U.S.C. section 2272 (1982)), or with workers in the entire airline industry (see 49 U.S.C. section 1552(h)(1) (1982)). Title VII provides benefits for workers at one corporation in one industry. As such, it is much more analogous to severance and other benefits that are paid by individual corporations to their laid-off workers which are not unemployment compensation either by the terms of section 85 or otherwise. *Williams v. Commissioner, supra.* We are reinforced in this conclusion by the fact that in enacting 45 U.S.C. section 797d(b) (1976) Congress dealt specifically with the problem of unemployment compensation and did not see fit specifically to categorize the

---

[15]The Senate committee report states that the provision "would treat the allowance [the termination benefits] as if it had been paid as regular wages for the purpose of establishing future eligibility." S. Rept. 97-139, *supra* note 6, at 333.

[16]The other programs described as unemployment compensation in the regulations (sec. 1.85-1(b)(1)(iv), Income Tax Regs.), are clearly such.

termination payment involved herein as such compensation either directly or by way of describing them as supplementary to such compensation as they did with the Trade Readjustment and Airline Deregulation Programs. Under these circumstances, we are unable to conclude that the general policy concern of Congress for the protection of laid-off Conrail employees provides a sufficient foundation for recharacterizing as unemployment compensation what is clearly a termination allowance.

To reflect the foregoing,

*Decisions will be entered for the respondent.*

Reviewed by the Court.

STERRETT, NIMS, PARKER, WHITAKER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, WILLIAMS, WELLS, and WHALEN, *JJ.*, agree with the majority opinion.

CHABOT, *J.*, concurs in the result only.

RUWE, *J.*, did not participate in the consideration of this case.

———

PARR, *J.*, dissenting: I respectfully dissent from that portion of the majority's opinion which holds that title VII benefits are includable in petitioners' gross income. I believe that 45 U.S.C. section 797d(b) (1976) excludes these amounts from gross income, and in so doing carries out the intent of Congress in enacting NERSA.

It is true that section 61(a) taxes all income except that which is specifically exempted, and that such exemptions are construed narrowly. It is clear, however, that 45 U.S.C. section 797d(b) does properly carve out an exemption from gross income for the benefits at issue herein.

The plain, unambiguous language of 45 U.S.C. section 797d(b) indicates that title VII benefits are to be considered "compensation" solely for two specified purposes. The term "solely for" means "exclusively for" or "only for." *United States v. Esperdy,* 277 F.2d 537, 538 (2d Cir. 1960); *Stockton Harbor Industry Co. v. Commissioner,* 216 F.2d 638, 645 (9th Cir. 1954), cert. denied 349 U.S. 904 (1955). The statute, as worded, exempts title VII benefits from

being considered "compensation" for *any other purpose,* including Federal tax purposes, and not just other title 45 purposes, as the majority believes. Congress did not preface this provision with the words "For purposes of this title."

Although there are many forms of gross income other than compensation, respondent's theory is clearly that title VII benefits constitute compensation. Respondent cites several authorities for his assertion that termination and severance payments are taxable, all of which turn on the rationale that these benefits are taxable *precisely because they are forms of compensation.* See sec. 1.61-2, Income Tax Regs.; sec. 31.3401(a)-1, Employment Tax Regs.; Rev. Rul. 75-44, 1975-1 C.B. 15. He also cites numerous cases which likewise find payments to terminated employees to be compensation for services and not gifts or other nontaxable forms of income. See, e.g., *Commissioner v. Duberstein,* 363 U.S. 278 (1960); *Beggy v. Commissioner,* 23 T.C. 736, affd. per curiam 226 F.2d 584 (3d Cir. 1955). The only argument presented which would characterize these benefits as a form of taxable income other than compensation was petitioner's argument that if taxable, the benefits are properly taxable as unemployment compensation (which is, of course, another form of compensation).

The majority does not suggest any theory other than compensation under which these benefits would be taxable. Indeed, I can think of none. These payments were not, for instance, capital gain, prize winnings, or dividends. Under the well-settled case law, regulations, and respondent's own revenue ruling they would be taxable as compensation, *absent* the unambiguous language of 45 U.S.C. section 797d.

In enacting 45 U.S.C. section 797d(b), Congress provided that title VII benefits would not be considered compensation for Federal tax purposes. Since there is no other theory under which these amounts would logically be taxed, I believe Congress intended to exempt them from the broad scope of section 61(a). See section 1.61-2, Income Tax Regs., which includes termination and severance pay as taxable compensation *unless excluded by law.*

The legislative history of NERSA supports this conclusion. Congress had two goals in mind when it enacted title VII. The first was to save Conrail, whose operations were

"hopelessly unprofitable," and make it more salable to private industry. This would be accomplished by eliminating an estimated 4,600 Conrail employees and repealing title V, "the most expensive labor protection provision in labor history," which had become an impossible burden. S. Rept. 97-101 at 9-10 (1981); H. Rept. 97-153 at 2-3 (1981); S. Rept. 97-139 at 332 (1981). The second goal was to set up a new employee protection system for Conrail employees to replace the repealed title V. The new labor protection provisions were to be "fair and reasonable." S. Rept. 97-101, at 9-10 (1981). See also 127 Cong. Rec. 19,126 (July 31, 1981). These objectives were codified in 45 U.S.C. section 1101.

The concern for employee protection was obviously the purpose behind the enactment of 45 U.S.C. section 797d(b), which clarified the treatment of title VII benefits and insured the recipients' rights to receive unemployment compensation. Making these benefits nontaxable was in keeping with the purpose of providing Conrail's employees with fair and reasonable benefits. Congress knew that thousands of railroad employees would lose their jobs and that the generous title V provisions (which had provided for job security, subsistence allowances, monthly displacement allowances and salary continuation) were simultaneously being eliminated. The intent was to provide for these displaced workers fairly, insofar as Conrail's financial situation would permit. The amounts were limited to $20,000, and specified deductions for items such as health and welfare benefits were expressly mandated. If income taxes were to further reduce these benefits, there would be little left over to compensate these individuals whom Congress had intended to protect.

The Supreme Court recently stated that "exemptions from taxation are not to be implied." *United States v. Wells Fargo Bank*, 485 U.S. ____ , ____ (1988).[1] The exemption

---

[1] The facts in the instant cases are distinguishable from those of *Wells Fargo*. In that case, the Supreme Court held that certain public housing agency obligations, known as "Project Notes," were not exempt from estate tax despite the language of sec. 5(e) of the Housing Act of 1937, 50 Stat. 890, which states that such obligations "shall be exempt from all taxation." The Court noted the settled principle that exemptions from taxation must be unambiguous and not implied. Despite the language of the Housing Act provision, there was ambiguity: secs. 2001 and 2002 specifically included Project Notes in a decedent's taxable estate. Further, the generally understood meaning of "all taxation" was "direct taxation," which did not include the estate tax, an excise tax. The Court thus found that without an express exemption from estate tax, the statute the taxpayers relied on did not even support their claim for tax

of title VII benefits from gross income was plainly stated by Congress. Congress is clearly aware of the consequences of the term "compensation," which generally encompasses all payments from a taxpayer's en.ployer or in exchange for a taxpayer's labor. See generally sec. 1.61-2, Income Tax Regs.; *Commissioner v. Duberstein, supra.* Had Congress said nothing, these payments would be taxable as compensation under section 61. Congress expressly carved out an exception for these benefits by using the phrase "solely for." Title VII benefits are not compensation for any purposes other than the two specified in 45 U.S.C. section 797d(b), and Federal taxation is not one of those two purposes. This is in accord with the opinions of the two District Courts that have considered this issue. See *Sutherland v. United States,* 664 F. Supp. 211 (W.D. Pa. 1987), revg. on motion for reconsideration 664 F. Supp. 207 (W.D. Pa. 1986); *Herbert v. United States,* 662 F. Supp. 573 (S.D. N.Y. 1987), on appeal (2d Cir., July 30, 1987).

I would hold that these benefits are not includable in petitioner's gross income, and that we need not reach the issue of whether they should be taxed as unemployment compensation.

KÖRNER, *J.,* agrees with this dissent.

---

exemption. Nor did the court find the legislative intent to be unambiguously in favor of a tax exemption. In contrast, we are faced with a single unambiguous statute with unambiguous legislative history.