OHIO TEAMSTERS EDUCATIONAL AND SAFETY TRAINING TRUST FUND, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9089–80X.    Filed August 4, 1981.

*Michael P. Mahoney*, for the petitioner.

*Bernard B. Kornmehl* and *Elizabeth DePriest*, for the respondent.

## OPINION

RAUM, *Judge*: The Commissioner determined that petitioner does not qualify for exemption from income taxation as an organization described in section 501(c)(3), I.R.C. 1954, and petitioner has invoked the jurisdiction of this Court to obtain a declaratory judgment as to its exempt status.[1] The questions presented are whether petitioner is organized exclusively for exempt purposes; whether petitioner is operated for private, rather than public, interests; and whether petitioner's earnings inure to the benefit of private individuals.

The case was submitted on the basis of the stipulated administrative record, which is incorporated herein by reference. The factual representations in the administrative record are accepted as true. Rule 217(b), Tax Court Rules of Practice and Procedure.

Petitioner Ohio Teamsters Educational & Safety Training Trust Fund is a trust organized on November 29, 1976, pursuant to an agreement and declaration of trust between the Ohio Conference of Teamsters (the union) and the Labor Relations Division of the Ohio Contractors Association (the association). The trust agreement was amended on February 19, 1980. Petitioner's principal place of business is Columbus, Ohio. Its application for recognition of exemption under section 501(c)(3) was filed with the Internal Revenue Service

---

[1]The jurisdictional requirements specified in sec. 7428, I.R.C. 1954, have been satisfied: petitioner is the organization whose exempt status is in issue; it has exhausted its administrative remedies; and this action was timely filed. Sec. 7428(b), I.R.C. 1954; see Rule 210(c), Tax Court Rules of Practice and Procedure.

on February 25, 1977. The Commissioner issued a final adverse ruling on March 25, 1980.

Petitioner was organized pursuant to a collective bargaining agreement between the union and the association. In the course of allocating a financial settlement reached by management and labor representatives, the labor representatives requested establishment of a scholarship fund. As a result, the collective bargaining agreement provided as a condition of employment that the employer-members of the Contractors Association would contribute to an educational and safety training trust fund. Petitioner's sole source of support is from employer contributions to the fund pursuant to the collective bargaining agreement. The amount of each employer's contributions is determined under the collective bargaining agreement by the number of hours of employment of the employer's covered employees. Effective May 1, 1976, the agreement required each contractor to contribute 5 cents to the fund for each hour of such paid employment. As of January 31, 1977, petitioner had received $14,474.68 in contributions.

The trust agreement details the purposes of the fund as follows:

The Fund shall be a Trust Fund and shall be used for the purposes of fostering, planning, supervising, conducting, and in other ways developing: (i) scholarship programs for the benefit of employees, their families and dependents for study at educational institutions, (ii) training programs in safety, equal employment opportunity, and other work related subjects; (iii) programs to improve and advance the interests and common good and benefit of all employees, their families and dependents, of contributing employers engaged in the construction and contracting business in the State of Ohio, as may be authorized in Section 302(c) of the National Labor Relations Act, as amended from time to time, and Section 501(c)(3) of the Internal Revenue Code, as amended from time to time, pursuant to the AGREEMENT AND DECLARATION OF TRUST; also to provide the means for financing the expenses of the Board of Trustees and the operation and administration of the Fund, all of which shall be done on a nonprofit basis, whereby no part of the net earnings of this Trusteeship shall enure to any private individual or member; and in the event of the dissolution of this Trust the accrued funds and assets of the Fund shall be disbursed as herein provided and not otherwise.

The trust agreement provides that the employer contributions to the trust "shall not constitute or be deemed wages due to individual employees." No employee has a right to receive any part of the contributions to the trust, except to the extent

they are paid out as grants to accomplish the purpose of the trust, and benefits may not be assigned upon termination of the trust or severance of employment. The trust agreement states that it is the intention of the parties that employer contributions to the fund are to be deductible as necessary business expenses for tax purposes and should not be subject to withholding or social security tax.

The management and control of the trust is vested in a board of trustees, consisting of two union trustees designated by the union and two employer trustees designated by the association. The trustees are to formulate an educational and safety training program for employees, their families, and dependents to obtain scholarship assistance for study at educational institutions, and to further safety, equal opportunity, and other work related programs, as described in the purposes clause of the agreement. To achieve the purposes of the trust, the trustees are given various powers to invest the funds of the trust and to pay the expenses of trust administration.

The trust expressly provides that it is the intent of the creators that the trust be exempt from taxation under section 501(c)(3), I.R.C. 1954, and the trustees are instructed to make the necessary applications to accomplish this purpose. The trust agreement, as amended, further specifies that no part of the trust's net earnings is to inure to the benefit of its "members, trustees, officers or other private persons," except for the payment of reasonable compensation for services to the trust and to make distribution to further the trust's purpose. Under the amended trust agreement, the trust is precluded from engaging in substantial lobbying or political campaign activities, and may not carry on activities not permitted for organizations exempt from tax under section 501(c)(3), I.R.C. 1954. Upon dissolution of the trust, the trustees are required to dispose of all trust assets exclusively for purposes of the trust or to the other qualified section 501(c)(3) organizations.

Petitioner has not yet begun operation, pending recognition of its exemption from taxation. It proposes to award grants to cover tuition, fees, and books for applicants pursuing various educational programs. There is some confusion in the administrative record as to the class of persons eligible to receive grants, but in a statement (Exhibit 17-Q) submitted on behalf

of the trust, there appears the following clarifying explanation:

It is the construction of the Trust agreement by the Trustees and their intent in the future administration of the Fund that benefits be provided only for union employees of contributing employers and their dependents. The Fund in operation will not benefit all employees of contributing employers, but only those within the bargaining unit.

Grants will be available for the following programs, in the following order of priority established by the trustees:

1. Completion of high school
2. Adult education course in areas related to the construction industry
3. Vocational education courses
   A. Industry-related fields
   B. Non-industry-related fields
4. College and university courses
   A. Industry-related fields
   B. Non-industry-related fields
5. Graduate school courses
   A. Industry-related fields
   B. Non-industry-related fields
6. Trade conferences and seminars in areas related to the construction industry
7. Others, as determined by the trustees

The trustees intend to disburse all funds available for scholarship aid in each year. Financial assistance will be granted based on the priority of the programs to be pursued by the applicant. For example, all applicants for financial assistance to complete high school will receive grants before applicants seeking funds for lower priority programs will be considered. If funds are not available to satisfy all of the applicants for a particular priority of program, then recipients will be selected on the basis of the priority of applicant criteria. The following applicant priorities will be applied: employees of contributing employers, spouses of employees, dependents of employees, and maximum length of service in the industry. Thus, if funds are available to provide grants to all applicants for completion of high school, adult education courses, and vocational education courses, but funds are insufficient to award grants to all applicants for college and university courses, employee applicants will have priority over spouses and dependents. In cases where priority of programs

and applicants does not provide the means for determining grant recipients, the financial needs of the applicants will be considered.

An employee need not be employed for a certain number of years to be eligible for the program. A grant will not be rescinded or terminated because a recipient or his parent terminates employment subsequent to the awarding of the grant.

Applicants will be selected by a scholarship selection committee, as specified in the following amendments to petitioner's bylaws:

## ARTICLE VII

### Scholarship Selection Committee

Section 1. *Scholarship Selection Committee.* Annually, the Trustees shall select a Selection Committee of up to three members consisting wholly of individuals totally independent and separate from The Ohio Teamsters Educational and Safety Training Trust Fund, The Ohio Conference of Teamsters of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, The Ohio Contractors Association, the Associated General Contractors of America, Inc., and any Employer contributing to the Trust Fund. The Committee selected shall have sole responsibility for the selection of recipients of grants from the Trust Fund. The individuals selected for the Committee shall consist of individuals knowledgeable in the education field, possessing the background and knowledge to properly evaluate the potential of applicants for grants.

Section 2. The Trustees shall verify the eligibility of an applicant for a grant under the terms of the Trust. The Selection Committee shall determine if the applicants for grants meet the minimum standards for admission to the educational institution or program for which the grants are available. No person shall be considered eligible if they would not reasonably be expected to attend such an institution, however, even if they meet such minimum standards.

Section 3. The Selection Committee shall select grant recipients from applicants determined by the Committee to be eligible. The selection and the order recommended shall be based upon the priority criteria established by the Trustees.

Section 4. *Percentage Reduction.* In order to meet the percentage tests of Revenue Procedure 76–47, the Selection Committee shall delete from the list of grant recipients the Employees or the spouses and children of Employees to the extent necessary to comply with the following percentage limitations to be imposed on an Employer-by-Employer basis:

(1) In the case of grants to Employees of a particular Employer, the awards granted in any year to such Employees shall not exceed 10% of the number of Employees who were: (a) eligible, (b) applicants for such grants, and (c) considered by the Selection Committee in selecting the recipients of

grants in that year. Provided, that this percentage limitation shall not operate to disqualify all Employees of a particular Employer in any year.

(2) In the case of grants to spouses ·and children of Employees of a particular Employer, the number of· grants awarded to such spouses or children shall not exceed: (a) 25% of the number of spouses and children who were: (i) eligible, (ii) were applicants, and (iii) were considered by the Selection Committee in the selecting of recipients of grants in that year; or (b) 10% of the number of Employees' spouses and children who can be shown to be eligible for grants (whether or not they submitted an application) in that year. Provided, that the application of these percentage tests shall not operate to make all spouses and children of a particular Employer ineligible for a grant in any year.

In a revised statement (contained in a protest to the Commissioner's proposed adverse ruling), petitioner estimates that the pool of potential grantees amounts to between 15,000 and 17,000 persons inclusive of spouses· and dependents of eligible employees. Petitioner does not consider it possible to estimate the number of applicants under the plan, since the educational needs and desires of the potential grantees will determine the number of applicants. When the plan is operational, there will be advertising and publicity concerning the program in both employer and union publications, as well as announcements on employer and union bulletin boards and other means of communication.

In explaining his final adverse ruling issued with respect to petitioner's exempt status under section 501(c)(3), the Commissioner listed the following reasons:

You are not organized or operated exclusively for exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1954. You are not organized exclusively for one or more exempt purposes specified in section 501(c)(3), and you are operated for private interests rather than public interests. Also, your net earnings inure to the benefit of private individuals.

With respect to the operational test, the Government contends that petitioner provides educational assistance grants to employees as compensation for services rendered under the collective bargaining agreement. Although the Government concedes that the trust may further educational purposes by encouraging educational efforts by employees, it argues that when an educational grant program is used as part of a compensation package in a collective bargaining agreement, its primary purpose is compensatory, rather than

charitable. Petitioner contends that its grant program complies with the guidelines set forth in Rev. Proc. 76–47, 1976–2 C.B. 670, and that compliance with these guidelines establishes that its educational grant program is not operated for a compensatory purpose.

On the basis of the facts in the administrative record, we conclude that petitioner has failed to establish that it is operated "exclusively" for exempt purposes, irrespective of the fact that its proposed activities to some extent further charitable purposes. Since failure to satisfy the operational test is itself a sufficient basis for denial of petitioner's application for recognition of exempt status under section 501(c)(3),[2] we do not address the Government's other arguments, including its contention that petitioner fails to meet the organizational test.

An organization may qualify for exemption from income taxation under sections 501(a) and 501(c)(3), I.R.C. 1954, only if it is operated "exclusively" for one or more of the exempt purposes specified under section 501(c)(3). In order to determine whether petitioner's activities meet the operational test, we must ascertain the purpose such activities are intended to achieve, since it is the purpose, and not the nature of the activities, which is determinative under the operational test. See *Federation Pharmacy Services v. Commissioner*, 72 T.C. 687, 691 (1979), affd. 625 F.2d 804 (8th Cir. 1980); *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356–357 (1978); *Golden Rule Church Association v. Commissioner*, 41 T.C. 719, 728 (1964). Here, petitioner proposes to engage in only one activity, the payment of cash grants to employees, their spouses, and dependents who wish to further their education. However, one activity may further multiple purposes, both exempt and nonexempt, and in such situations it is necessary to determine whether the nonexempt purposes are predominant, or at least more than insubstantial. Compare *Elisian Guild, Inc. v. United States*, 412 F.2d 121, 124 (1st Cir. 1969); *American Inst. for Economic Research v. United States*, 302 F.2d 934, 938 (Ct. Cl. 1962), cert. denied 372 U.S. 976 (1963); *est of Hawaii, Inc. v. Commissioner*, 71 T.C. 1067, 1079 (1979), affd. by unpublished order 647 F.2d 170 (9th Cir. 1981); and

[2]See sec. 1.501(c)(3)–1(a)(1), Income Tax Regs.

*B.S.W. Group, Inc. v. Commissioner,* 70 T.C. at 357 & n. 2, with *Harding Hospital, Inc. v. United States,* 505 F.2d 1068, 1072 (6th Cir. 1974); *St. Louis Union Trust Co. v. United States,* 374 F.2d 427, 431 (8th Cir. 1967); and *Christian Stewardship Assistance, Inc. v. Commissioner,* 70 T.C. 1037, 1041–1042 (1978). See also sec. 1.501(c)(3)–1(e)(1), Income Tax Regs.

It cannot fairly be disputed that petitioner's educational assistance program to some extent furthers exempt purposes. The granting of scholarships for the pursuit of educational activities certainly furthers the "advancement of education," one of the purposes defined as "charitable"[3] in the regulations.[4] Sec. 1.501(c)(3)–1(d)(2), Income Tax Regs. Nonetheless, since qualification for payments from the fund arises from the employment relationship between contributors to the fund and their employees, a compensatory purpose is also suggested, and we must therefore consider whether petitioner's primary purpose is to provide a form of compensation for past or future services rendered by employees under the collective bargaining agreement with the association. Cf. *Bingler v. Johnson,* 394 U.S. 741, 756–757 (1969); *Stewart v. United States,* 363 F.2d 355, 357 (6th Cir. 1966). The provision of additional compensation or benefits for employment services is not an exempt purpose. See *Duffy v. Birmingham,* 190 F.2d 738, 740–741 (8th Cir. 1951); cf. *Watson v. United States,* 355 F. 2d 269, 274 (3d Cir. 1965) (Smith, J., concurring); *Estate of Leeds v. Commissioner,* 54 T.C. 781, 791 (1970). Thus, if petitioner's principal purpose is to provide compensation for employment services rendered to petitioner's contributors, petitioner is not operated exclusively for any of the exempt purposes described in section 501(c)(3) and is therefore not an

---

[3] Petitioner might also be found to further "educational" purposes, although the regulations defining this term seem to restrict its application to organizations actually offering courses of instruction or otherwise presenting programs of an educational nature. See sec. 501(c)(3)–1(d)(3), Income Tax Regs.

[4] Indeed, in 1969, Congress recognized the importance of funding for scholarships and encouraged the formation of joint labor-management trust funds for the provision of scholarships and child care centers by amending the Labor-Management Relations Act to permit their establishment. Pub. L. 91–86, 83 Stat. 133 (1969). See H. Rept. 91–286, 91st Cong., 1st Sess., reprinted in [1969] U.S. Code Cong. & Adm. News 1159, 1160–1162. However, these provisions in no way undertook to deal with the tax aspects of such funds, which were obviously left to be considered under the provisions of the Internal Revenue Code.

exempt organization. *Miss Georgia Scholarship Fund, Inc. v. Commissioner*, 72 T.C. 267, 271 (1979).

On the basis of the administrative record, the conclusion is unavoidable that petitioner's principal purpose is to provide a form of compensation for employment services rendered under the collective bargaining agreement. In a protest of a proposed adverse ruling on petitioner's exempt status, petitioner's creation was explained as follows:

> In the negotiations which resulted in the establishment of this fund, a financial settlement was reached between the management and labor representatives. In allocating the agreed dollar settlement between direct compensation and various other employee benefits, the union representatives requested that a scholarship fund be established. Their stated purpose was and is to encourage increased education among their membership and their families. Amounts contributed to this fund could have otherwise been direct compensation to the union members working under the contract.

This protest further states that "employer payments to the Fund may be considered as made in lieu of other compensation to the union members." Under the collective bargaining agreement, each employer is required to contribute 5 cents per hour for each hour paid to each union employee covered by the collective bargaining agreement. If an employer fails to make the required contributions[5] to the fund, covered employees are entitled to strike until the required contributions are paid.

The above contractual provisions and the circumstances of petitioner's creation clearly establish that petitioner is operated primarily to provide a form of indirect compensation to employees covered by the collective bargaining agreement. Petitioner was created as a result of a contract settlement allocating an agreed dollar amount between wages and other employee benefits; if the contributing employers were not paying 5 cents an hour into the fund, they would be paying

---

[5]The words "contributions" and "contribute" are euphemisms in the context of this case. Although these expressions have been used by the parties and we have followed their practice in this respect, the payments made by the employers to the trust were hardly 'contributions" in the usual sense of donations or voluntary gifts by disinterested donors. Cf. *Commissioner v. Duberstein*, 363 U.S. 278 (1960). They were plainly involuntary payments made under the compulsion of contractual obligations exacted from the employers by the Union. Sec. 7 of art. VI of the collective bargaining agreement sets forth in detail the procedures to be followed by the trustees in collecting these obligatory payments. Moreover, sec. 6 of art. XII of the agreement specifically contemplates that employers would claim deductions for such payments as "necessary business expenses"; there is no suggestion that they would seek to deduct them as charitable contributions.

this amount either as cash compensation or other employee benefits. If the agreed employer contributions to petitioner are not paid, the collective bargaining agreement authorizes the union members to strike, just as would be expected if the employees failed to receive wages or other employee benefits earned by their performance of services pursuant to the collective bargaining agreement.

It is true that no employee is guaranteed benefits under the plan, and that employer contributions to the trust are arguably excludable from income of the employees at the time of their receipt as "scholarships."[6] However, as a result of the bargained-for employer contributions, employees, their spouses, and dependents obtain a potential source of funds for education which would not be available except for the existence of an employment relationship with contributors to the fund. This bargained-for benefit may be regarded as part of the compensation of the employees for services performed under the collective bargaining agreement. Cf. *Grant-Jacoby, Inc. v. Commissioner*, 73 T.C. 700, 708 (1980); *Armantrout v. Commissioner*, 570 F.2d 210, 212–213 (7th Cir. 1978). Although there may well be instances where an employer funded scholarship program could be found to be operated primarily to advance the educational objectives of the employees or their dependents, and thus operated "exclusively" for charitable purposes within the meaning of the statute,[7] notwithstanding the fact that such a program also provides a form of compensation to the employees, this is not the present situation. Here, the "scholarship" program was a negotiated fringe benefit which the employers are contractually obligated to provide or suffer

---

[6]Rev. Proc. 76–47, 1976–2 C.B. 670, provides guidelines for determining whether grants made by an employer-related educational assistance foundation qualify as scholarships under sec. 117(a), I.R.C. 1954. We express no opinion as to whether petitioner's grants would qualify as "scholarships" under this revenue procedure.

[7]Rev. Proc. 76–47, 1976–2 C.B. 670, provides guidelines for determining whether grants by a private foundation are scholarships subject to sec. 117(a), and therefore not taxable expenditures under sec. 4945, when grants are made to employees or dependents of a particular employer. Although the guidelines are explicitly not directed to the question of whether the foundation's grants are consistent with exempt status, the promulgation of such guidelines suggests that an employer-related grant program may properly qualify for exempt status in appropriate circumstances. Cf. also *Chase v. Commissioner*, a Memorandum Opinion of this Court 19 T.C.M. 234, 29 P-H Memo T.C. par. 60,049 (1960); but cf. also *Charleston Chair Co. v. United States*, 203 F. Supp. 126 (E.D. S.C. 1962).

a strike. In the circumstances, we find that petitioner was operated primarily for the purpose of providing deferred compensation for services rendered under the collective bargaining agreement, and is thus not operated exclusively for exempt purposes. Petitioner therefore does not qualify for exemption from income taxation under sections 501(a) and 501(c)(3).

Petitioner contends that *Chase v. Commissioner*, a Memorandum Opinion of this Court (19 T.C.M. 234, 29 P-H Memo T.C. par. 60,049 (1960)); Rev. Rul. 67–72, 1967–1 C.B. 125; and Rev. Rul. 72–101, 1972–1 C.B. 144, require a decision in its favor. However, that case and the rulings involve situations that are distinguishable from the circumstances herein. In *Chase*, the Court concluded that the trustees of a foundation granting scholarships to employees and their children did not intend that the scholarship program be compensation for services or inducement for employees to remain in the company's employ, and therefore determined that the foundation was exempt. 19 T.C.M. at 250, 29 P-H Memo T.C. par. 60,049 at 60–281. In contrast, the evidence in the administrative record herein establishes that the trust was created as an integral part of the compensation for employees negotiated under a collective bargaining agreement. In the revenue rulings relied on by petitioner, various joint labor-management nonprofit organizations established under collective bargaining agreements operated training programs for individuals seeking to acquire skills in a particular industry. These organizations were held to be operated for the purpose of improving or developing the capabilities of the trainees, an educational purpose. See Rev. Rul. 67–72, *supra*, 1967–1 C.B. at 126; Rev. Rul. 72–101, *supra*, 1972–1 C.B. at 145. However, although the organizations were supported by contributions made under a collective bargaining agreement, the employees covered by the collective bargaining agreement (or their spouses or children) do not appear to have been singled out as the sole beneficiaries of the training program. We do not find *Chase* or these and other rulings cited by petitioner to be applicable here.

*Decision will be entered for the respondent.*