John Roberts MARTIN; Shirley Mae Martin; Bernard J. Spanski; and Margaret L. Spanski, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 88–1808.

United States Court of Appeals, Sixth Circuit.

Argued April 11, 1989.

Decided June 5, 1989.

John E. Rogers (argued), Alexandria, Va., for John Roberts Martin, Shirley Mae Martin, Bernard J. Spanski, and Margaret L. Spanski, Petitioners–Appellants.

William F. Nelson, I.R.S., David I. Pincus (argued), Nancy G. Morgan, U.S. Dept. of Justice, Tax Div. Appellate Section, Gary R. Allen, and William S. Rose, Jr., Asst. Attorney Gen., Dept. of Justice, Tax Div., Washington, D.C., for C.I.R., respondent-appellee.

Before KEITH and KENNEDY, Circuit Judges; and McQUADE, District Judge.[*]

KENNEDY, Circuit Judge.

Taxpayers, John Roberts Martin and Bernard J. Spanski,[1] appeal from the United States Tax Court's decision [2] upholding the Commissioner's assessment of taxes on benefits they received under Title VII of the Northeast Rail Service Act as terminated Consolidated Rail Corporation (ConRail) employees. Taxpayers concede that the payments are includable in gross income under section 61,[3] but contend that such payments are "in the nature of unemployment compensation" under section 85. These are test cases for approximately 4,500 to 5,400 similarly situated former ConRail employees. We agree with the Tax Court that the payments should be characterized as termination benefits rather than as "unemployment compensation"; accordingly, we affirm.

I.

The facts of these consolidated cases are undisputed. John Martin and Bernard Spanski are former employees of ConRail. They lost their jobs in 1982 as a result of

---

[*] The Honorable Richard B. McQuade, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1. Taxpayer's wives, Shirley Mae Martin and Margaret L. Spanski, are parties solely because they filed joint tax returns with their husbands.

2. Reported at 90 T.C. No. 72 (1988).

3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.

actions taken under the Northeast Rail Service Act (NERSA) of 1981, Pub.L. No. 97–35, 95 Stat. 643, which amended the Regional Rail Reorganization Act of 1973 (3R Act), Pub.L. No. 93–236, 87 Stat. 985. Congress enacted NERSA in order to reduce ConRail's costs and make it more attractive to private buyers. NERSA eliminated approximately 4,600 ConRail positions,[4] and replaced the "extremely costly [employee] protection scheme set forth in Title V of the [3R Act]",[5] with Title VII of NERSA, 45 U.S.C. §§ 797–797m.

Martin and Spanski were eligible for Title VII benefits under 45 U.S.C. § 797, which provides for "[a]llowances to employees deprived of employment," 45 U.S.C. § 797(b)(1), with a maximum benefit limit of $20,000. 45 U.S.C. § 797(d). The Railroad Retirement Board (Board), which administers Title VII, provided taxpayers with two options: (1) a lump-sum $20,000 separation allowance; or (2) remain in furlough status, retain seniority, and receive a daily subsistence allowance, continued health and welfare coverage, new career training assistance, and reimbursement for moving expenses, up to a maximum benefit of $20,000. *See* 20 C.F.R. § 395.3 (1988).[6]

Mr. Spanski elected the first option, and in 1982 received a lump-sum separation allowance of $19,589.00 (the $20,000 maximum benefit less health coverage premiums paid on his behalf by the Board). The Board neither withheld taxes nor issued a Form 1099 or W–2. On their joint tax return, the Spanskis did not declare the lump-sum payment as taxable income.

Mr. Martin elected the second option. During 1982, he received a Title VII subsistence allowance of $8,609.49, plus health coverage premiums paid on his behalf in the amount of $311.20. In 1983, he received a subsistence allowance of $9,373.00. As with the Spanskis, the Board did not withhold taxes or issue Forms W–2 or 1099 for the 1982–1983 payments. Likewise, the Martins did not report the payments as taxable income.

In 1984, the Board sent Martin and Spanski letters entitled "Title VII Tax Statement." 90 T.C. No. 72, at 6–7. The letters informed them that "[t]he Internal Revenue Service has ruled that all Title VII benefits with the exception of health and welfare premiums are subject to Federal income tax," *id.*, and that they would have to file amended returns. Martin was assessed $806.00 for 1982 as "taxable ConRail income," and $423.00 for 1983 as "U.S. Railroad Retirement" income. Spanski was assessed $3,393.00 on the $20,000 lump sum he received in 1982 as taxable "Railroad Retirement" income.

Taxpayers petitioned the United States Tax Court. They conceded that their Title VII benefits are gross income under section 61(a), which includes "all income from whatever source derived." They argued, however, that the benefits should be treated as "unemployment compensation" under section 85. The Tax Court first found, *sua sponte*, that the benefits were includable in gross income under section 61(a) as a threshold to reaching the section 85 issue. It then held that the benefits are *not* "in the nature of unemployment compensation" within the meaning of section 85. The Tax Court found no statutory language or legislative history indicating that Congress intended the programs to be treated as "unemployment compensation," and it distinguished two recognized unemployment compensation programs: The Trade Act of 1974 (19 U.S.C. §§ 2291–92) and The Airline Deregulation Act of 1978

---

4. In enacting NERSA, Congress estimated that "[a]bout 4600 positions are at issue, and their elimination would make [ConRail] more saleable." S.Rep. No. 139, 97th Cong., 1st Sess. 332, *reprinted in* 1981 U.S.Code Cong. & Admin. News 396, 620. The Commissioner estimates that over 5,400 related cases will be affected by this decision. 90 T.C. No. 72, at 3 n. 5.

5. S.Rep. No. 139, *supra,* note 4, 1981 U.S.Code Cong. & Admin.News at 620.

6. The parties agree that no distinction is necessary between the two options to resolve the issues in this case. *See* 90 T.C. No. 72, at 6 n. 8; Commissioner's Brief at 4 n. 7; Taxpayers' Brief at 5 n. 13. However, at oral argument, the Government acknowledged that the option to remain in furlough status and retain seniority is a closer case than the lump-sum benefit.

(49 U.S.C.App. § 1552(b)). *See* Treas.Regs. § 1.85–1(b)(iv)(C, E).

## II.

■■■ Taxpayers challenge the Tax Court's conclusions of law, which are subject to *de novo* review by this Court. *See Walter v. Commissioner,* 753 F.2d 35, 38 (6th Cir.1985). Because the parties concede that the Title VII benefits are gross income under section 61(a), we do not rule on the issue. We note, however, that the two Courts of Appeals which have considered the issue agree with the Tax Court that 45 U.S.C. § 797d(b) does not exclude the payments from taxable gross income. *See Sutherland v. Commissioner,* 865 F.2d 56 (3d Cir.1989); *Herbert v. United States,* 850 F.2d 32 (2d Cir.1988).[7] *See also Slattery v. United States,* 16 Cl.Ct. 79, 63 A.F.T.R.2d 549 (1988) (same).

On the question of whether the Title VII benefits are "in the nature of unemployment compensation" under section 85, the parties advance essentially the same legal arguments as those made before the Tax Court. Taxpayers first contend that Congress intended the Title VII benefits to be treated as unemployment compensation, and that the benefits meet the Supreme Court's definition of unemployment compensation. Second, they maintain that the Tax Court incorrectly distinguished two other governmental unemployment compensation programs listed as examples in the Treasury Regulations: The Trade Act of 1974 (19 U.S.C. §§ 2291–92) and The Airline Deregulation Act of 1978 (49 U.S.C. App. § 1552(b)). *See* Treas.Regs. § 1.85–1(b)(iv)(C, E).[8] The Commissioner relies on the Tax Court's analysis, adding the two arguments "that [the payments] are not unemployment compensation both because Congress defined them as compensation and because, under 45 U.S.C. section 797d(a) (1982), they were in exchange for other benefits that had previously been payable to employees." 90 T.C. No. 72, at 13.[9]

---

**7.** 45 U.S.C. § 797(b) provides:

**(b) Treatment of benefits**

Any benefits received by an employee under an agreement entered into pursuant to section 797 of this title and any termination allowance received under section 797a of this title shall be considered compensation solely for purposes of—

(1) the Railroad Retirement Act of 1974 (45 U.S.C. 231 et seq.); and

(2) determining the compensation received by such employee in any base year under the Railroad Unemployment Insurance Act (45 U.S.C. 351 et seq.).

The Second and Third Circuits, and the Tax Court, found that the language and legislative history of NERSA did not unambiguously provide for a tax exclusion, and the payments are thus includable under the broad phraseology of section 61(a). *See Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 430, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955).

**8.** The Treasury Regulations provide in pertinent part:

**§ 1.85–1 Unemployment Compensation.**

. . . .

**(b)(iv) Examples of governmental unemployment compensation programs.** Governmental unemployment compensation programs include (but are not limited to) programs established under:

(A) A State law approved by the Secretary of Labor pursuant to section 3304 of the Internal Revenue Code of 1954.

(B) Chapter 85 of Title V, United States Code, relating to unemployment compensation for Federal employees generally and for ex-servicemen.

(C) *Trade Act of 1974, sections 231 and 232 (19 U.S.C. §§ 2291 and 2292).*

(D) Disaster Relief Act of 1974, section 407 (42 U.S.C. § 5177).

(E) *The Airline Deregulation Act of 1978 (49 U.S.C. § 1552(b)).*

(F) The Railroad Unemployment Insurance Act, section 2 (45 U.S.C. § 352).

(Emphasis added.) Taxpayers make no attempt to analogize Title VII benefits to the other Treasury Regulation examples, which are clearly unemployment compensation programs.

**9.** As with the Tax Court, we find it unnecessary to address these arguments, which are not persuasive in any event. First, much of the difficulty regarding this case flows from the fact that it is not clear how Congress intended to define these benefits. It is left to the courts to characterize the payments. Second, the argument that the Title VII payments were given in exchange for waiving Title V benefits ignores the fact that the waiver was "a technical provision intended to bar an employee from accepting the protections of the bill while challenging its exclusivity in the courts." S.Rep. No. 139, *supra,* note 4, 1981 U.S.Code Cong. & Admin. News at 623. Congress explicitly repealed Title V's provisions. *Id.*

We are in complete agreement with the Tax Court's section 85 analysis, which is reported at 90 T.C. No. 72, at 11–15.[10]

### A. Congressional Intent

Section 85 defines "unemployment compensation" as "any amount received under a law of the United States, or of a State, which is in the nature of unemployment compensation." Although unemployment compensation is now fully taxed under section 85, Tax Reform Act of 1986, Pub.L. 99–514, 100 Stat. 2085, for the years at issue section 85 provided for limited taxation depending on a taxpayer's other gross income and the amount of unemployment compensation received.[11] The parties agree that the benefits were "received under a law of the United States," leaving the issue of whether such benefits were "in the nature of unemployment compensation."

This is a case of first impression. There is scarce statutory language or legislative history to guide the Court on whether Title VII benefits should be treated as "in the nature of unemployment compensation" under section 85. Not only is the statutory language and legislative history of NERSA silent on the tax treatment of Title VII benefits, see Herbert, 850 F.2d at 35–36, "The legislative history [of section 85] is [also] silent as to the standards by which potential unemployment compensation programs are to be judged." 90 T.C. No. 72, at 12 n. 14 (citing H.Rept. 96–1445, at 48–49 (1978), reprinted in 1978–3 C.B. 181, 222–223).

The Treasury Regulations state that, "Generally, unemployment compensation programs are those designed to protect taxpayers against the loss of income caused by involuntary layoff." Treas.Reg. § 1.85–1(b). This statement is echoed by the Supreme Court in California Department of Human Resources Development v. Java, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). Taxpayers quote the Supreme Court's statement that, "[t]he ob-

jective of Congress [in enacting the unemployment compensation insurance program] was to provide a substitute for wages lost during a period of unemployment not the fault of the employee." Id. at 130, 91 S.Ct. at 1353. Taxpayers reason that because Congress' purpose in enacting NERSA was to provide "protection for ConRail employees who lose their jobs as a result of transactions authorized by this bill...." S.Rep. No. 139, supra, note 4, 1981 U.S.Code Cong. & Admin.News at 620, and that this purpose is the same as that for enacting the unemployment compensation program, Congress must therefore have intended the Title VII benefits to be "unemployment compensation."

This argument is unpersuasive. The Java case involved a recognized state unemployment compensation program. See Treas.Reg. § 1.85–1(b)(iv)(A) ("A State law approved by the Secretary of Labor"). The issue before the Court was limited to construing a procedural requirement as to the timing of unemployment compensation payments, and did not require distinguishing between unemployment compensation and other fully taxable termination benefits. Taxpayers' Congressional intent argument is further weakened by the fact that the legislative history of NERSA is silent as to the tax treatment of Title VII benefits. See Herbert, 850 F.2d at 35–36.

Taxpayers also argue that Congress must have intended the NERSA benefits to be "unemployment compensation" because its provisions are similar to provisions under the Milwaukee Railroad Restructuring Act, 45 U.S.C. § 901 et seq.; and the Rock Island Railroad Transition and Employee Assistance Act, 45 U.S.C. § 1001 et seq. Taxpayers maintain that these programs, which named benefits "supplementary unemployment insurance" and "subsistence allowance," respectively, are equivalent to NERSA's "[a]llowances to employees deprived of employment." 45 U.S.C. § 797(b)(1).

---

**10.** The Tax Court decided this case by a 17–2 margin. One member of the majority concurred in the judgment only. The two dissenters would hold that the payments were not includable in gross income under section 61, and did not reach the unemployment compensation issue.

**11.** See 26 U.S.C. § 85 (1982).

This argument is likewise unpersuasive. First, taxpayers have cited no authority construing the Milwaukee or Rock Island Acts. Taxpayers make the unsupported assumption that these acts must be construed as unemployment compensation. While we make no holding on the applicability of section 85 to these acts, the Commissioner correctly points out that even if those programs are covered as "unemployment compensation" under section 85, they are distinguishable from NERSA because benefits are offset by the amount of unemployment compensation received, just as the recognized Airline Deregulation Program. *Compare* 49 U.S.C.App. § 1552(b)(1) (Airline Program assistance reduced by "amount of any unemployment compensation received by the protected employee"), *with* 45 U.S.C. § 909(c) (Milwaukee Railroad "[s]upplementary unemployment insurance" benefits reduced by "benefits payable ... under the Railroad Unemployment Insurance Act ... or under any State unemployment insurance program").

B. Distinguishing the Recognized Unemployment Compensation Programs

Taxpayers reiterate their argument to the Tax Court that two of the programs recognized as "unemployment compensation" in the Treasury Regulations, § 1.851(b)(iv)(C, E)—The Trade Act of 1974, 19 U.S.C. §§ 2291–92, and The Airline Deregulation Act of 1978, 49 U.S.C.App. § 1552(b)—are indistinguishable from Title VII of NERSA. We agree with the Tax Court's analysis distinguishing the two programs, as follows:

First, both [programs] were specifically designed to provide supplements to unemployment compensation—to be eligible for the Trade Readjustment Program, an applicant's unemployment compensation benefits must be exhausted, 19 U.S.C. section 2291(a)(3) (1982), and payments under the Airline Deregulation Program are reduced by the amount of unemployment compensation received, 49 U.S.C. section 1552(b)(1) (1982). No such tie to unemployment compensation exists with the Title VII benefits—they are payable before, and regardless of whether, any application for unemployment compensation is made. Second, the programs that petitioners point to are of a more general applicability than Title VII. They deal either with workers throughout the country who have become unemployed because of international trade, see 19 U.S.C. section 2272 (1982), or with workers in the entire airline industry, see 49 U.S.C. section 1552(h)(1) (1982). Title VII provides benefits for workers at one corporation in one industry. As such it is much more analogous to severance and other benefits that are paid by individual corporations to their laid-off workers which are not unemployment compensation either by the terms of section 85 or otherwise. *Williams v. Commissioner,* [35 T.C. 685, 687 (1961)].

90 T.C. No. 72, at 14–15. We find especially persuasive the fact that taxpayers receive these benefits in addition and without regard to any unemployment benefits to which they are entitled.

We join the Tax Court in being "unable to conclude that the general policy concern of Congress for the protection of laid-off ConRail employees provides a sufficient foundation for recharacterizing as unemployment compensation what is clearly a termination allowance." 90 T.C. No. 72, at 15.

AFFIRMED.