THE NEWSPAPER GUILD OF NEW YORK, TIMES UNIT-THE NEW YORK TIMES COLLEGE SCHOLARSHIP FUND; GENE I. MAEROFF; ELBERT ATKINSON; PAT SCUOTTO; JOSEPH EISENBERG; SHIRLEY CAMPBELL; and NEIL P. FITZPATRICK, TRUSTEES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Newspaper Guild of New York etc. v. Commissioner
Docket No. 36472-85X.
United States Tax Court
T.C. Memo 1989-314; 1989 Tax Ct. Memo LEXIS 314; 57 T.C.M. (CCH) 812; T.C.M. (RIA) 89314; 11 Employee Benefits Cas. (BNA) 1130; June 27, 1989. W. Donald Nyland, for the petitioner. Kevin C. Reilly and Michael Goldbas, for the respondent. COHEN
MEMORANDUM OPINION COHEN, Judge: Respondent determined that petitioner does not qualify for exemption from Federal income tax under section 501(a) as an organization described in section 501(c)(3). Petitioner challenges respondent's determination and has invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428. The issue for decision is whether petitioner is operated exclusively for an *316 exempt purpose within the meaning of section 501(c)(3). Our decision depends on whether the provision of scholarship aid to a limited percentage of the children of employees pursuant to a collective bargaining agreement is an indirect form of compensation rather than an exempt purpose. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for 1985, the year the petition was filed. All rule references are to the Tax Court Rules of Practice and Procedure. The case was submitted on the basis of the stipulated administrative record. The facts as represented in the administrative record are assumed true. Rule 217(b). Additionally, some of the facts have been separately stipulated, and the stipulated facts are incorporated herein by this reference. Background
The Newspaper Guild of New York, Times Unit - The New York Times College Scholarship Fund (petitioner) is a trust with its principal office located in New York City. In 1964 the New York Times Company, for itself and its wholly owned subsidiary Interstate Broadcasting Company, Inc. (together "the Times"), proposed extending the expiration date of its collective *317 bargaining agreement with The Newspaper Guild of New York (the Guild), a local union, to match the expiration date of collective bargaining agreements between other New York newspaper publishers and unions. The Times proposed a $ 4.13 per week average wage increase in consideration for that extension, and the Guild's leadership suggested that $ 0.13 of the increase be used to establish a scholarship fund for children and dependents of employees of the Times represented by the Guild. Of the seven bargaining units involved represented by the Guild, only the unit membership at the Times voted to allocate $ 0.13 of the proposed wage increase to the scholarship fund. These negotiations between employer and union resulted in creation of petitioner by a trust agreement dated March 5, 1965, made by the Times, the Guild, and the original trustees (the trust agreement). Petitioner's board of trustees consists of three representatives of the Times and three representatives of the Guild. The trust agreement was amended effective May 7, 1968, and March 26, 1974. In 1965 respondent granted petitioner exempt status as an organization described in section 501(c)(3). Subsequent to this initial *318 grant of exempt status, sections 509 and 4945 were enacted. Pursuant to these sections, petitioner is an employer-related, grant-making private foundation that is required to meet the eligibility requirements of Rev. Proc. 76-47, 1976-2 C.B. 670, to avoid liability for excise taxes under section 4945. Petitioner submitted a request for advance approval of grant-making procedures pursuant to Rev. Proc. 76-47; but respondent denied this request on the ground that grants offered by petitioner were fringe benefits under a labor agreement rather than qualified scholarships under section 117. Respondent modified petitioner's status to that of an organization exempt from taxation as a voluntary employees' beneficiary association under section 501(c)(9); however, such status means that the awards provided by petitioner are not considered scholarships under section 117 but rather are taxable income to the recipient's parent. (Use of the word "scholarship" is for convenience only and not intended to classify any payment of money as a qualified scholarship under section 117.) Petitioner is funded exclusively through payments from the Times under the trust agreement *319 and the collective bargaining agreement. Petitioner does not actively solicit contributions from other sources. By amendments to the original trust agreement and collective bargaining agreement, the Times' payments to petitioner have changed from the original $ 0.13 per week per employee first to .106 percent and later to .109 percent of the straight-time payroll for all employees covered by the collective bargaining agreement. The provision in the collective bargaining agreement requiring the Times to fund petitioner is found in Article VII, which also sets forth the contractual obligations of the Times concerning life insurance, pensions, death or disability benefits, hospital and medical coverage, travel accident insurance, and joint study of ways to improve certain fringe benefits. Should the Times ever fail to make the agreed payments to petitioner, it would be in breach of the employment contract. For the 8-year period from 1979 through 1986, contributions to petitioner, the approximate average number of employees, and the contribution per employee were as follows: Contribution
Contributions
Employees
Per Employee
1986
$ 94,194
2,106
$ 44.73
1985
89,069
2,097
42.47
1984
88,672
2,161
41.03
1983
80,717
2,150
37.54
1982
74,907
2,147
34.89
1981
68,725
2,079
33.06
1980
62,370
2,082
29.96
1979
58,917
2,110
27.92
Average
$ 77,196
2,117
$ 36.45
*320 Paragraph 5 of the trust agreement states petitioner's purpose as, "To pay or provide for the payment of college scholarships for the benefit of those children and dependents of employes that the Trustees shall determine to be eligible for such scholarships pursuant to paragraph 7 hereof." Paragraph 7 in turn provides in pertinent part the following: Any child or dependent of a Times' employe who is a Guild member shall be eligible for a scholarship. The Trustees shall be authorized and empowered to make determinations with respect to such matters as the definition of "dependent," "child," "employe," or other provisions concerning eligibility as the Trustees may deem appropriate. "Guild member" as used herein shall mean an employe of The Times represented by the Guild. To be eligible for scholarship funds from petitioner, an applicant must: (a) be a child or dependent of an employee of the Times who is represented by the Guild; (b) be a high school senior or college student; and (c) plan to attend an accredited college or university on a full-time basis to pursue a bachelor's degree, an R.N. degree, or an associate degree. Awards are not conditioned upon the recipient's pursuing *321 a course of study beneficial to petitioner, the Times, or the Guild or accepting employment with any of those entities upon graduation. The applicant's parent or supporter must have been employed by the Times for at least 6 months before the application deadline. If an applicant's parent or supporter leaves the bargaining unit other than by death or retirement before the application submission deadline, that applicant is no longer eligible for a grant from petitioner for the upcoming school year. If, however, the applicant's parent or supporter leaves the bargaining unit after the application submission deadline, the applicant's eligibility for a subsequently awarded grant for the upcoming school year is not withdrawn. The original trust agreement limited the amount of each scholarship to $ 500 per year; but a subsequent amendment directs the trustees annually to determine the amount awarded. The amount awarded each academic year is the same for each recipient regardless of whether a new or renewal award is granted. Petitioner's trustees determine the number of grants to be awarded each year based on the amount of funds available and the amount of each award to be made. The amounts *322 awarded for the academic years indicated were as follows: Academic Year
Award Amount
1987/88
$ 2000
1986/87
$ 1800
1985/86
$ 1700
1984/85
$ 1600
1983/84
$ 1500
1982/83
$ 1500
1981/82
$ 1300
1980/81
$ 1200
1979/80
$ 1200
1978/79
$ 1100
Awards are paid directly to the school to which the recipient has been admitted rather than to the student. Pursuant to the provisions of the trust agreement, petitioner maintains an independent "panel of educators" composed of college administrators and teachers selected by the trustees to rank scholarship applicants with regard to academic achievement, future potential, and character, among other factors. Each applicant must submit to the panel a completed application form, test scores from college entrance examinations if applying for the first time, high school and/or college transcripts, and a recommendation from an advisor or teacher. The trust agreement does not indicate any minimum standard against which these materials are to be judged. The panel does not consider an applicant's economic need or the work performance with the Times of the applicant's parent or supporter. Applicants who submit incomplete *323 application materials are ineligible for consideration for an award. Each scholarship is for 1 year only but is renewable annually for a total of 4 years. The panel considers applications for award renewals before ranking applicants for new awards. The panel of educators does not scrutinize applications for renewals with the same intensity as applications for first-time awards, and renewal is routinely granted. Only one application for renewal was denied during the period 1978 through 1987. Each member of the panel of educators independently ranks the applicants for new awards and submits that ranking to the chairman, who then compiles a composite ranking that is sent to petitioner's administrator. Prior to the 1985/86 academic year, the exact number of compositely ranked applicants forwarded to the administrator depended on the number of new awards available as previously specified by the trustees. For the 1985/86 academic year and following years, all applicants were ranked. (Nothing in the record indicates that the panel of educators is free to withhold a ranking from an applicant it considers unqualified for higher education if the applicant has submitted all the required *324 application materials.) Upon receiving the composite rankings from the panel of educators and the number and amount of available scholarships from the trustees, the administrator notifies the scholarship winners in strict rank order according to the composite list submitted by the panel. Petitioner's scholarship selection process yielded the following results regarding new scholarship applicants and recipients for the 10 academic years indicated: Percentage
Academic
Applications
Scholarships
Receiving Awards
Year
Issued
Filed
Awarded
Issued
Filed
1987/88
48
39
10
20.8%
25.6%
1986/87
42
35
9
21.4 25.7 1985/86
60
48
12
20.0 25.0 1984/85
69
53
24
34.8 45.3 1983/84
55
40
23
41.8 57.5 1982/83
51
42
18
35.8 42.9 1981/82
62
47
15
24.2 31.9 1980/81
52
38
15
28.8 39.5 1979/80
52
44
10
19.2 22.7 1978/79
87
62
12
13.8 19.4 Average
58
45
15
26.0%
33.6%
The percentage of applicants receiving scholarships for the 1978/79 school year is less than other years due to reduced employer contributions to the fund due to a strike by Guild members *325 in 1978. While the governing documents do not set out an official policy of limiting the number of grant recipients to a particular percentage of all eligible or actual applicants, since 1985 petitioner has unofficially limited the number of recipients to approximately 25 percent of actual applicants. This unofficial limitation is based on the advice of petitioner's attorneys that the recipients may be subjected to tax liability if the number of awards exceeds 25 percent of actual applicants. Petitioner's trustees formerly opposed any such limitation as "unacceptable for the purposes and intent of this fund," and they continue to refuse to amend the trust agreement to provide percentage limitations on the number of scholarships awarded. If sufficient funds were available, all applicants could receive awards without violating any agreement. Discussion
Primarily relying on our decisions in Ohio Teamsters Educational and Safety Training Trust Fund v. Commissioner,77 T.C. 189 (1981), affd. 692 F.2d 432 (6th Cir. 1982), and Local Union 712, I.B.E.W. Scholarship Trust Fund v. Commissioner,T.C. Memo. 1983-76, respondent argues *326 that because petitioner was organized pursuant to a collective bargaining agreement, its primary purpose is compensatory rather than charitable. Respondent alternatively contends that petitioner is not operated exclusively for exempt purposes because the earnings of petitioner inure to the benefit of private interests, i.e., employer and employee. Petitioner contends that the grants are scholarships as contemplated by section 117 and do not constitute compensation because they are awarded to a low percentage of children and dependents of employees on a competitive basis. Petitioner also contends that revocation of its 501(c)(3) status would subvert the intention of the fund to promote and encourage higher education, which intention Congress has expressly recognized as an important public policy when dealing with collectively bargained funds. Petitioner has the burden of proving that respondent's revocation of its 501(c)(3) status is erroneous. Rule 217(c)(2)(i); P.L.L. Scholarship Fund v. Commissioner,82 T.C. 196, 199 (1984). On the basis of the administrative record and the stipulated facts, we conclude that petitioner has failed to establish that it is operated *327 exclusively for exempt purposes. Because we base our decision on this conclusion, we need not consider respondent's alternative argument that petitioner's funds inure to the benefit of private interests. An organization may qualify for exemption from income tax under sections 501(a) and 501(c)(3) only if it is operated exclusively for one or more of the exempt purposes specified under section 501(c)(3). Exclusivity in this instance does not mean "solely" or "without exception," but rather contemplates that any nonexempt activities be only incidental and less than substantial. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.; Bethel Conservative Mennonite Church v. Commissioner,80 T.C. 352, 359 (1983), revd. on other grounds 746 F.2d 388 (7th Cir. 1984). A substantial nonexempt purpose will disqualify an organization from exemption under section 501(c)(3) regardless of the number or importance of its exempt purposes. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.; Better Business Bureau v. United States,326 U.S. 279, 283 (1945); Bethel Conservative Mennonite Church v. Commissioner, supra.It is the purpose of petitioner's *328 activities and not their nature that determines whether petitioner is operated exclusively for exempt purposes. Ohio Teamsters Educational and Safety Training Trust Fund v. Commissioner,77 T.C. at 196. The granting of scholarships for the pursuit of educational activities certainly furthers the advancement of education, one of the purposes defined as charitable in the regulations. Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs. Nevertheless, because qualification for grants from the fund arises from the employment relationship between the Times and employees represented by the Guild, a compensatory purpose is also apparent. The provision of additional compensation or benefits for employment services is not an exempt purpose. Ohio Teamsters Educational and Safety Training Trust Fund v. Commissioner,77 T.C. at 197. The origin of funding for petitioner was a proposed wage increase. The Guild suggested and the employees voted to accept the fund in lieu of direct compensation. Petitioner acknowledges that, "The goal of unit leadership was to transform a portion of the offered increase from direct wages to a fringe or welfare fund contribution that would *329 serve to enhance the welfare and socioeconomic future of the unit's general membership." As in Ohio Teamsters, establishment of petitioner provided employees with a potential source of funds for the education of their children and dependents that would not be available absent an employment relationship with the Times. If the Times ever failed to make payment to petitioner as required by the collective bargaining agreement, then the Times would have breached the contract in the same manner as if it had unilaterally tried to reduce wages by refusing to pay employees the full amounts specified in the collective bargaining agreement or withheld required contributions to the pension fund. Petitioner attempts to distinguish Ohio Teamsters by noting that the trust agreement involved in that case specifically provided that contributions to the taxpayer were "a condition of employment"; employees had an express right to strike if payments to the taxpayer were not made; applicants were prioritized based on length of service; industry-related adult and vocational education received priority over college and university courses; employees themselves were eligible to receive grants; establishment *330 of the fund was negotiated on behalf of an association of employers and employees of more than one employer; and there were no reliable estimates as to how many applicants would receive grants because the fund had not yet begun operation. Most of these factual distinctions were not relied upon by the Court in Ohio Teamsters. The express right to strike over failure to make payments to the fund was given prominence by the Court in Ohio Teamsters; but the mere lack of such an express provision in the collective bargaining agreement between the Times and the Guild does not mean that such a right to strike does not exist. The collective bargaining agreement between the Times and the Guild contains no express right to strike clause at all; however, employees represented by the Guild did strike the Times in 1978. There is no persuasive difference between the Times' contractual obligation to finance the scholarship fund pursuant to the collective bargaining agreement and the Times' contractual obligation to pay wages. In a similar vein, petitioner contends that, because Congress has expressly identified employer-related scholarship funds as a nonmandatory subject of bargaining, *331 such plans are not included in the term "wages, hours and other terms and conditions of employment" and so should not be considered compensatory. Section 302(c)(7) of the Labor Management Relations Act of 1947, 29 U.S.C. sec. 186(c)(7) (1982), (LMRA) provides in part that "no labor organization or employer shall be required to bargain on the establishment of any such [employer-related scholarship] trust fund, and refusal to do so shall not constitute an unfair labor practice." Employer-related scholarship funds are therefore nonmandatory subjects of bargaining. Section 8(d) of the LMRA provides in pertinent part: (d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the *332 making of a concession * * *. [29 U.S.C. sec. 158(d).] The Supreme Court has interpreted section 8(d) of the LMRA to mean that "wages, hours and other terms and conditions of employment" are mandatory subjects of bargaining. NLRB v. Wooster Division of Borg-Warner Corp.,356 U.S. 342 (1958). Petitioner contends that employer-related scholarship funds such as itself are therefore not "wages, hours and other terms and conditions of employment" and thus cannot be characterized as direct compensation or as a quid pro quo for the signing of a collective bargaining agreement. As we noted in Ohio Teamsters, however, the provisions of the LMRA did not attempt to deal with the tax aspects of collectively bargained scholarship funds. 77 T.C. at 197 n. 4. Furthermore, the act of Congress in specifically identifying employer-related scholarship funds as nonmandatory subjects of bargaining may be interpreted as an implicit recognition on the part of Congress that such plans are indeed compensatory and would be a mandatory subject of bargaining absent a specific provision to the contrary. Cf. Herbert v. United States,850 F.2d 32, 34-36 (2d Cir. 1988); *333 Martin v. Commissioner,90 T.C. 1078, 1082-1084 (1988), affd. F.2d (6th Cir., June 5, 1989). Petitioner contends that because the scholarship fund is competitive, and no employee or child or dependent of an employee ever has a vested interest in the fund, petitioner's purpose cannot be compensatory. Regardless of the competitive nature of awarding petitioner's funds, a benefit provided by an employer may be compensatory even though no employee is assured of obtaining such benefit. Local Union 712, I.B.E.W. Scholarship Trust Fund v. Commissioner,T.C. Memo. 1983-76; see also Ohio Teamsters Educational and Safety Training Trust Fund v. Commissioner,77 T.C. at 199. A not insubstantial purpose of petitioner's operations is to provide compensation for past or future services rendered by employees under the collective bargaining agreement. Petitioner thus is not operated exclusively for an exempt purpose. Accordingly, Decision will be entered for the respondent.